**F I L E D**

**PUBLISH**

**May 4, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KATHERINE DOROTHEA
WATSON, as guardian for Kortney
LaMon Lewis, an incapacitated
person,

      Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

      Defendant-Appellee.

No. 05-6262

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-04-537-C)**

---

Submitted on the briefs:[*]

R. Thomas Seymour, C. Robert Burton, Scott A. Graham, Seymour Law Firm,
Tulsa, Oklahoma, for Plaintiff-Appellant.

John C. Richter, United States Attorney, Robert A Bradford, Assistant United
States Attorney, Oklahoma City, Oklahoma, for Defendant-Appellee.

---

Before **O'BRIEN**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

---

[*]After examining appellant's brief and the appellate record, this panel has
determined unanimously that oral argument would not materially assist the
determination of this appeal. *See* Fed. R. App. P. 34(a)(2) and 10th Cir. R.
34.1(G). The case is therefore ordered submitted without oral argument.

**GORSUCH**, Circuit Judge.

Katherine Dorothea Watson, on behalf of Kortney LaMon Lewis, an incapacitated former federal prisoner, sued under the Federal Tort Claims Act, alleging that the government responded negligently to Mr. Lewis's medical condition and, as a result of its negligence, Mr. Lewis suffered a brain hemorrhage that left him severely and permanently disabled. After a three-day bench trial, the district court found the government not liable. In this appeal, Ms. Watson presents, among other things, two legal questions related to the admission of expert testimony: whether an expert witness who demurs when asked to profess his expertise should, automatically and by virtue of that admission alone, be precluded from testifying; whether all experts must always render written reports as a precondition to being permitted to take the stand. For reasons detailed below, we answer both questions in the negative and affirm the district court's judgment.

I

A

Viewing the facts in the light most favorable to the district court's ruling, as we are obliged to do, they indicate that, on August 6, 2001, Kortney LaMon Lewis, a then-inmate at the Federal Correctional Institute in El Reno, Oklahoma ("FCI El Reno"), underwent brain surgery at Norman Regional Hospital after a

fellow inmate fractured Mr. Lewis's skull during a fight the preceding evening. *See* Mem. Op. at 2, 5. Following three days of recovery, Mr. Lewis's doctor at Norman Regional Hospital discharged him as "neurologically normal except for mild speech problems." *Id.* at 2. Mr. Lewis then spent approximately a week in Parkview Hospital, located closer to the prison in El Reno, where he received speech and physical therapy. *See id.* at 2-3. Ultimately, Parkview Hospital also discharged Mr. Lewis, this time to the medical team at FCI El Reno with an instruction that he continue speech and occupational therapy; the hospital suggested no need "for further observation, hospitalization, nursing care, or immediate follow-up." *Id.* at 3; *see also id.* at 4 ("[T]he Parkview discharge instructions lack any instruction for further hospitalization or observation.").

Mr. Lewis thus returned to FCI El Reno, where prison officials placed him in the special housing unit in which medical personnel made daily rounds. *Id.* at 3-4. Mr. Lewis did not request any medical assistance during his initial days there, although he "was still slurring his speech and required further speech therapy." Mem. Op. at 4-5. On the evening of August 18, 2001, while escorting Mr. Lewis back from the showers to his cell "a few minutes before 7:25 p.m.," according to the district court, prison guards "noticed that Lewis was suffering from worsened slurred speech, difficulty completing sentences, and trouble walking." *Id.* at 5. Nonetheless, the guards did not notify medical personnel at

the prison's health services unit ("HSU") and instead simply placed Mr. Lewis back in his cell. *See id.*

Around 7:25 p.m., Mr. Lewis called for help. Responding guards found him lying unconscious on his cell floor; they immediately summoned the HSU's physician's assistant, who arrived within two minutes and transferred Mr. Lewis to the HSU. *See id.* at 6. At 7:42 p.m., following the prison's policy, the physician's assistant called the closest ambulance service to the prison, and the district court found that Ms. Watson "did not establish that [the physician's assistant] could have called for an ambulance any sooner than he did at 7:42 p.m." *Id.* The ambulance arrived at the prison gate within three or four minutes, cleared security after approximately ten minutes more, and arrived at the HSU at 7:56 p.m. *See id.* The district court found that "[t]his was the quickest any ambulance crew could have reached Lewis to begin transport to a hospital for services." Mem. Op. at 6. The ambulance crew then took ten to fifteen minutes to prepare Mr. Lewis for transport and several additional minutes to clear security at the prison before departing FCI El Reno at 8:19 p.m.; the district court found no evidence that any ambulance service, air or ground, could have left the prison any sooner. *Id.* at 7.

The private ambulance crew independently decided, without direction from the government, to take Mr. Lewis to the two-minute-away Parkview Hospital, where they arrived at 8:21 p.m, as opposed to another nearby alternative, the

twenty-minute-away Mercy Hospital; the district court found no persuasive evidence that sending Mr. Lewis to another hospital such as Mercy would have resulted in a more favorable outcome. *Id.* at 7. "Indeed, the more compelling evidence indicated that if [Mr.] Lewis had been sent to Mercy via ambulance, he likely would not have survived." *Id.* Forty-two minutes after arriving at Parkview Hospital and following a CT scan in which the doctors found a large intracerebral hematoma, medical personnel administered to Mr. Lewis the drug Mannitol,[1] which reduced the pressure on his brain. *See id.* At 9:54 p.m., Parkview Hospital then transferred via ambulance the stabilized Mr. Lewis to Norman Regional Hospital for neurosurgery. *Id.* at 7-8. Sadly, Mr. Lewis left that hospital with severe impairments to his mental faculties. *See* Mem. Op. at 8 (describing Mr. Lewis as having left the hospital in a so-called "persistent vegetative state").

---

[1] Mannitol is "a 6-carbon sugar alcohol formed by reduction of mannose or fructose and widely distributed in plants and fungi. Official preparations, administered intravenously, are used as an osmotic diuretic in the prophylaxis of acute renal failure, in the evaluation of acute oliguria, and for reducing intraocular and cerebrospinal fluid pressure and volume." Dorland's Illustrated Medical Dictionary 1055 (29th ed. 2000); *see also* Stedman's Medical Dictionary 1062 (27th ed. 2000) ("The hexahydric alcohol, widespread in plants, derived by reduction of fructose; used in renal function testing to measure glomerular filtration, and intravenously as an osmotic diuretic. SYN manna sugar, mannite.").

B

On April 29, 2004, Ms. Watson, as guardian to Mr. Lewis, sued the government under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) ("FTCA"), claiming, *inter alia*, that the government acted negligently in its response to Mr. Lewis's medical condition. *See* Aplt. App. at 13-14, 22-23. On June 20, 2005, the United States District Court for the Western District of Oklahoma held a three-day bench trial, after which the court found no legal basis for imposing liability. *See* Mem. Op. at 1; Aplt. App. at 10-11.

Citing the discretionary-function exemption to the government's waiver of sovereign immunity, *see* 28 U.S.C. § 2680(a), the district court found that the "decision by FCI El Reno to contact Parkview Ambulance Service for assistance when inmates are found unresponsive and in need of medical care above that able to be provided at FCI El Reno is governed by the discretionary function." Mem. Op. at 12. In the alternative, the district court held that the government had not acted negligently in its response to Mr. Lewis's condition and that, even if the prison medical team had been negligent, its conduct "was not the proximate cause of Lewis's intracerebral hemorrhage or his resultant loss of function." *See id.* at 13-14. This is so, the district court found, because Mr. Lewis was not symptomatic until immediately before the hemorrhage, the hemorrhage was sudden and violent, prison officials did not unnecessarily delay summoning or admitting help, and prison officials had no role whatsoever in the medical

-6-

decision to transport Mr. Lewis to Parkview or Mercy Hospital.  *See id.* at 10-11.

Accordingly, even "under the best of circumstances," the district court found that

Mr. Lewis would not have received the necessary treatment (that is, Mannitol or

neurosurgery) before permanent brain damage occurred.  *Id.* at 12.

## II

At trial, and over repeated objection of Ms. Watson, the government sought

and obtained leave under Fed. R. Evid. 702 to present expert testimony by Dr.

Thomas Fred Goforth, the clinical director at the United States Department of

Justice's Bureau of Prisons' Federal Transfer Center in Oklahoma City,

Oklahoma.  Dr. Goforth testified that, in his opinion, the medical team at FCI El

Reno at all times acted professionally and competently in the treatment of Mr.

Lewis.  On appeal, Ms. Watson contends that the admission of Dr. Goforth's

testimony amounted to an abuse of discretion because (i) at his deposition, Dr.

Goforth seemed to deny possessing a relevant expertise; and (ii) Dr. Goforth

failed to prepare an expert report prior to taking the stand.  We address these

contentions in turn.

## A

What to do when an expert witness says he isn't really so expert?  This case

presents the rather unusual circumstance of a putative expert who seems to

disclaim his expertise under oath.[2]  Ms. Watson would have us hold the

government to its witness's admission and deem Dr. Goforth unqualified as a

matter of law.  But the Federal Rules of Evidence assign to the district court the

job of deciding whether an individual is sufficiently qualified to testify as an

expert, by virtue of training and experience and based on the facts and

circumstances of each case, subject of course to a tailored review in this court.

*See* Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 589-95 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999);

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997); *Bitler v. A.O. Smith Corp.*,

400 F.3d 1227, 1232 (10th Cir. 2004) (explaining that "[w]e review for abuse of

discretion the manner in which the district court exercises its *Daubert*

'gatekeeping' role in making decisions whether to admit or exclude testimony.

We will not, however, disturb a district court's ruling absent our conviction that it

is arbitrary, capricious, whimsical, manifestly unreasonable, or clearly

erroneous." (internal citations omitted)).

---

[2]  When initially asked at his deposition "[d]o you consider yourself an expert witness as you are sitting here today?," Dr. Goforth replied, "[n]o, no." Aplt. App. at 68.  Later, however, Dr. Goforth warmed to the idea, responding: "Let me rephrase that.  I certainly feel like I may be a little bit more expert than someone who has no prison experience as far as healthcare." *Id.*  Elsewhere, he testified:  "When we are talking about me, I am talking about meeting the standard of care in the community." *Id.* at 84; *see also id.* ("I don't know that Joe Schmidt knows what goes on in a prison, and I do."); *id.* at 85 ("And I have a feeling they don't know much about what happens in a prison.").

While a witness's self-estimation must surely factor into the district court's decision whether or not to receive his testimony, it is not necessarily dispositive under the Federal Rules of Evidence or our received precedents. And tempting though it might be to supplement our traditional case- and fact-specific inquiry with Ms. Watson's automatic rule that no witness who denies having the requisite expertise may testify, doing so would risk turning a substantive and serious examination by a district court judge about a proffered witness's suitability into a game of gotcha, allowing lawyers to set cross-examination traps for unwary individuals who do not make their living testifying in court but who nonetheless may have a very great deal to offer fact finders. While overly modest expert witnesses may not be exactly an everyday sort of problem in our legal system, neither can we ignore the prospect of mistakenly excluding a witness who really is expert but simply too demure to trumpet his or her qualities under cross-examination; it would hardly benefit the legal system to exclude from the stand self-deprecating individuals who rarely testify but have the expertise to do so in favor of those who are more extravagant and savvy to the legal system or who may make their living testifying in our courts. Our views on this score find echos in the holding of a sister circuit, which some time ago in a case involving another government employee who was not a professional testifier explained that, "[n]either the Bureau of Mines nor the mine inspector himself may have thought that he was or should be an expert. But it is the trial judge, and not the witness

. . . , who has the responsibility and discretion to determine whether a witness is qualified as an expert." *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 746 (7th Cir. 1974).

Applying our traditional abuse of discretion test to the facts and circumstances of this particular case, we are able to perceive no reversible error in the district court's decision to find Dr. Goforth to be an expert in health care in federal prisons, his modesty notwithstanding. Indeed, besides pursuing her argument for automatic-exclusion-by-virtue-of-admission, Ms. Watson herself mounts no challenge to Dr. Goforth's qualification or the merits of the district court's decision to receive his testimony. The undisputed facts establish that Dr. Goforth earned a medical degree from the University of Oklahoma; completed a family-practice residency at the University of Oklahoma; is board certified in family practice; has advanced training in cardiac, pediatric, and advanced trauma life support; served for four years as the clinical chief and emergency room director at Tinker Air Force Base, where he supervised the medical team; and served for five years as the medical director of the Federal Transfer Center. *See* Aplt. App. at 248-49 (outlining Dr. Goforth's credentials). Given this evidence in the record before us regarding Dr. Goforth's qualifications and the absence of any reason supplied by Ms. Watson to think Dr. Goforth unfit, we are unable to say that the district court abused its discretion in holding that Dr. Goforth's credentials demonstrated sufficient "knowledge, skill, experience, training, or

education" in the area of health care in federal prisons to be of use to the jury.

*See* Fed. R. Evid. 702.[3]

B

Ms. Watson contends that the district court also erred by failing to require

Dr. Goforth to prepare and present an expert report before taking the stand. The

rule of law in question, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure,

provides in pertinent part:

> Except as otherwise stipulated or directed by the court, this
> disclosure shall, with respect to a witness *who is retained or
> specially employed to provide expert testimony in the case or whose
> duties as an employee of the party regularly involved giving expert
> testimony*, be accompanied by a written report prepared and signed
> by the witness.

---

[3] In a different vein, Ms. Watson contends that Dr. Goforth should have
been excluded because he additionally admitted that he did not know the
"national" standard of care by which plaintiff's negligence claim was to be
measured in this case. *See* 76 Okla. Stat. § 20.1 (2002). Because Ms. Watson did
not argue this point in the district court, however, we are obliged to review it only
under our plain error standard. *See* Fed. R. Civ. P. 51(d)(2); *see also, e.g.,
McKenzie v. Benton*, 388 F.3d 1342, 1350-51 (10th Cir. 2004); *Macsenti v.
Becker*, 237 F.3d 1223, 1230-34 (10th Cir. 2001) (a party's failure to raise an
objection at trial deprives the proponent "the opportunity to offer other supporting
proof," disadvantages the trial judge by "not alert[ing] to the need of stating
*Daubert/Kumho* findings and analysis," and impairs appellate review "due to the
inadequacy of the record"). Neither do we see such error – that is error impairing
Ms. Watson's substantial rights and the integrity of judicial proceedings –
because Dr. Goforth did specifically and expressly testify about the standard of
care in the local community and the parties have identified for us no way in which
the relevant community standards of care differed in any material respect from
national standards.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). While the Rule focuses on those who must file an expert report, by exclusion it contemplates that some persons are not required to file reports and that these include individuals who are employed by a party and do not regularly give expert testimony. It is undisputed that Dr. Goforth meets exactly this description; accordingly, we, like the district court, can discern no violation of the applicable Rule.

Ms. Watson replies to this analysis less with a textual argument than a policy one; to her, it is grossly unfair to allow a party to call an expert to testify without first providing advance notice of his or her opinions. But there exist policy arguments on both sides of this debate, and the rulemakers, with the approval of Congress, have sought to balance those interests in Rule 26. On one hand, the rulemakers were clearly concerned about the fulsome and efficient disclosure of expert opinions when they adopted the report requirement for most cases and experts.[4] On the other hand, it is apparent that the rulemakers did not think reports should be required in all cases and seemed concerned, for example, about the resources that might be diverted from patient care if treating physicians were required to issue expert reports as a precondition to testifying:

---

[4] And, to be sure, the requirement of an expert report has advantages. *See, e.g.*, Ronald N. Boyce, *The New Federal Discovery Rules: 26(a)(1)&(2)-A Big Step in the Right Direction*, 3 Utah Bar. J. 16, 16-19 (1998) (comparing Rule 26(a)(2) report requirement with prior regime of propounding interrogatories to experts and contending that the current regime shortens depositions and reduces the cost of litigation).

> For convenience, this rule and revised Rule 30 continue to use the term "expert" to refer to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters. The requirement of a written report in paragraph (2)(B), however, applies *only* to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report. By local rule, order, or written stipulation, the requirement of a written report may be waived for particular experts or imposed upon additional persons who will provide opinions under Rule 702.

Fed. R. Civ. P. 26(a)(2)(B), Adv. Comm. Notes (emphasis added). Whatever one's views of Ms. Watson's wish that all experts be required to supply written reports, it is our office to apply, not second guess, congressionally approved policy judgments, and that judgment, delineated by the plain terms of Rule 26, did not include a requirement of a report in this case. If a different balance is to be struck with respect to the costs and benefits of expert reports, it must be accomplished through the mechanisms approved by Congress. *See* 28 U.S.C. §§ 2071-74.

Neither are we able to disregard that the Federal Rules of Civil Procedure approved by Congress *do* supply other mechanisms, besides formal reports, for extracting the views of an expert witness like Dr. Goforth; sandbagging is not necessarily inevitable. Generally all witnesses, regardless of their status, must be identified, with their contact information, in a party's Rule 26(a)(1)(A) disclosures. Moreover, parties must also disclose, *inter alia*, a copy or location of

-13-

"all documents, electronically stored information, and tangible things that are in possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment." Fed. R. Civ. P. 26(a)(1)(B). A party's failure to comply with these provisions, including with respect to its employees who (like Dr. Goforth) serve as expert witnesses, can result in the exclusion of witnesses and other sanctions. Fed. R. Civ. P. 37(c)(1). Likewise, all witnesses are subject to deposition, individual document demands, and other discovery the court deems necessary and appropriate. And, of course, as the Advisory Committee Notes indicate, *see supra* p. 13, district courts are empowered to go above and beyond what the Rules prescribe and, in appropriate circumstances, may require expert reports even from individuals such as Dr. Goforth.[5]

---

[5] Our rejection of Ms. Watson's argument on this score comports with how other circuits have addressed similar challenges, *see, e.g.*, *Fielden v. CSX Transp., Inc.,* --- F.3d ---, 2007 WL 1028941, at *1-6 (6th Cir. 2007); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756-57 (7th Cir. 2004), as well as with how commentators have read Rule 26(a)(2)(B), *see, e.g.*, 10 Fed. Proc., L.Ed. § 26:37; Boyce, 3 Utah Bar. J. at 18.

Relatedly but separately, Ms. Watson contends that she was "[a]t no time prior to trial . . . given the opportunity to examine on, whatever Dr. Goforth's 'expert' opinions were." Aplt. Op. Br. at 49-50. Given that Ms. Watson did not raise this concern before the district court, we may once again review only for plain error. *See supra* p. 11, n.3. And we find none for, in fact, Ms. Watson not only had the opportunity to examine Dr. Goforth's opinions, she actually deposed him with full knowledge that the government intended to call him as an expert witness, and she questioned him about his background; his prior knowledge of

(continued...)

-14-

III

Ms. Watson also challenges an array of the district court's factual findings supporting its conclusion that the government did not act negligently in its care of Mr. Lewis. But every trial is replete with conflicting evidence, and in a bench trial, it is the district court, which enjoys the benefit of live testimony and has the opportunity firsthand to weigh credibility and evidence, that has the task of sorting through and making sense of the parties' competing narratives. Precisely because we are so removed from the action of trial, we will disturb a district court's factual finding only when it is clearly erroneous – that is, a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer. *See Holdeman v. Devine*, 474 F.3d 770, 775-76 (10th Cir. 2007) (citing *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001)).

Ms. Watson first challenges the district court's finding that the government lacked notice of the need to observe closely Mr. Lewis for post-surgical complications upon his return to FCI El Reno. In aid of this argument, she represents that one of the government's experts, "Dr. [Don Forrest] Rhinehart[,]

---

[5](...continued)
Mr. Lewis's case (including his review of medical charts, other medical opinions, and prior depositions); his conversations with Assistant United States Attorneys; appropriate standards of care; and the alleged breaches thereof. *See* Aplt. App. at 52-94.

and Plaintiff's expert, Dr. [John] Coates, testified that Lewis needed observation on August 18, 2001, to meet the standard of care." Aplt. Op. Br. at 4. As it happens, however, Dr. Rhinehart's testimony was a bit more muddled than Ms. Watson suggests,[6] and, even assuming both Dr. Coates and Dr. Rhinehart testified exactly as she represents, the government presented contrary evidence. Specifically, the government cited two hospital discharge reports and testimony from other witnesses (Drs. Malcher and Goforth), all of which suggested that Mr. Lewis did not require observation upon his return to FCI El Reno; showed him to be neurologically normal except for mild speech problems; and indicated that he was discharged with the instruction only that he continue speech and occupational therapy, with no need for further observation, hospitalization, nursing care, or immediate follow-up. Given that competent evidence does indeed support the district court's factual findings in this case, we are unable to conclude that Ms. Watson has met her burden of showing clear error merely by pointing to competing testimony.

Second, Ms. Watson asserts that the district court erred when it found that the evidence failed to support a finding that the government was required to stock

---

[6] Dr. Rhinehart was asked: "If you're putting them there for observation, you can't have observation if you don't know what you're looking for; right?"; and responded: "Under that scenario, yes, sir." Trial Tr. at 424:6-9. We have not been pointed to testimony, however, that the government placed Mr. Lewis in the special housing unit for observation.

-16-

Mannitol at FCI El Reno to comply with the prevailing standard of care; Ms. Watson represents to us that her view is confirmed by the testimony of both parties' experts and certain regulations of the Bureau of Prisons. But Ms. Watson fails to point us to any evidence in the record to support her representations, and it is not our role to mine a lengthy trial record in an unaided hunt for evidentiary nuggets to support a party's arguments. *Cf. Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." (internal quotation omitted)). Moreover, there is at least some record evidence suggesting that, contrary to her assertion, Bureau of Prisons regulations did *not* require FCI El Reno to stock Mannitol. *See* Trial Tr. at 177:2-10 (outlining testimony that FCI El Reno stocked only medications actively used); *see also id.* at 329:3-9 (outlining testimony that Mannitol was not a medication normally administered outside of a hospital setting). And, again contrary to Ms. Watson's assertion, the government's experts, Drs. Goforth and Rhinehart, expressly testified that FCI El Reno did not violate the standard of care by failing to stock Mannitol.[7]

---

[7] *See* Trial Tr. at 307:19, 328:19-22 (Dr. Goforth's testimony: "Q. All right. Let's talk a little bit about Mannitol for a second. Was it standard of care in 2001 for an ambulatory clinic such as FCI El Reno to stock Mannitol? A. No."); *see also id.* at 394:12, 408:16-21 (Dr. Rhinehart's testimony: "Q. Are you aware if FCI El Reno has Mannitol or does not have Mannitol? A. It's my

(continued...)

To be sure, Ms. Watson cites to Dr. Coates, her own expert, who stated that FCI El Reno should have stocked Mannitol to meet the standard of care. *See* Trial Tr. at 3, 5 (identifying Dr. Coates as Ms. Watson's witness); *see also* Aplt. App. at 1965 (citing declaration of Dr. Coates in which he stated that FCI El Reno should have stocked Mannitol). But it is hardly clear error for the district court to credit Drs. Rhinehart's and Goforth's expert testimony rather than Dr. Coates's. Indeed, making sense of the battle of experts is the essence of most medical malpractice trials and Ms. Watson gives us no reason to think, as she must, that any reasonable fact finder would have to discredit the government's experts in favor of her own.

Third, Ms. Watson asserts that the district court erred in finding that the government's failure to summon an air ambulance with Mannitol on board was not required by the applicable standard of care; she points us to the testimony of Drs. Rhinehart, Goforth, and Malcher, who, she tells us, all testified that use of an air ambulance was required. But the record, again, does not support – and even tends to undermine – her assertion. Dr. Rhinehart testified only that "depending on distance," it is the standard of care to transport a patient via air ambulance, Trial Tr. at 427:1-10; he never stated that the distances in this case made an air

---

[7](...continued)
understanding they do not have. Q. Do you believe that [this] is a breach of the standard of care? A. No.").

ambulance necessary or even appropriate. Dr. Goforth testified that the failure to employ air ambulances at FCI El Reno, "when necessary," would breach the standard of care, Trial Tr. at 346:1-6, but Ms. Watson points us to no evidence suggesting that Dr. Goforth considered it "necessary" to transport via air ambulance Mr. Lewis given the facts and circumstances of this case. Finally, Dr. Malcher admitted that it is the standard of care to call for an air ambulance "if that is in the patient's best interest," Trial Tr. at 81:14-20, but she (like the others) never testified that summoning an air ambulance in this case would have been in Mr. Lewis's best interest.

Not only is Ms. Watson's argument unsupported on its own terms, the district court received ample evidence from other sources that an air ambulance was not necessary or in Mr. Lewis's best interest. Parkview Hospital, which sent a ground ambulance, was the closest hospital and only two minutes from FCI El Reno. One of Ms. Watson's experts, Dr. Coates, twice indicated that a land ambulance would have been "fine." Trial Tr. at 203:5, 204:5-7. And Ms. Watson presented no evidence that an air ambulance would have transported Mr. Lewis more quickly. Given all this, we can hardly hold that the district court committed reversible error in finding that the use of an air ambulance was unnecessary to comply with the applicable standard of care.[8]

---

[8] Ms. Watson's remaining factual challenges are no more availing. For example, she asserts that the district court erred in finding that Mr. Lewis's

(continued...)

* * *

For the foregoing reasons, we hold that the district court did not err in receiving the testimony of Dr. Goforth, in declining to require him to produce an expert report as a precondition to testifying, or in the findings it made in aid of its conclusion that the government did not act negligently in its care of Mr. Lewis.[9] Accordingly, the judgment of the district court is

*Affirmed.*

---

(...continued)
hemorrhage was "sudden and violent," occurring very near to 7:25 p.m. on August 18, 2001, rather than a "slow bleed" that might have been noticeable for some time such that the damage done to Mr. Lewis might have been anticipated. But in aid of her argument along these lines, Ms. Watson once again merely points us to the fact that the parties presented dueling expert testimony on this issue; the district court simply credited the government's expert witness over her own on this score, and Ms. Watson gives us no reason to suppose its decision to do so was clearly erroneous. Similarly, Ms. Watson asserts that the government violated the standard of care by failing to have the ambulatory team bring Mannitol to the prison, where it could have been rushed to Mr. Lewis. Yet again, however, Ms. Watson points us to no evidence in the record that FCI El Reno's failure to order the ambulance trauma team to bring Mannitol violated the applicable standard of care. Without such direction from her, we are unable to find clear error on the part of the district court.

[9] Because we affirm the district court's holding that the government was not negligent in its care of Mr. Lewis, we need not pass on the legal sufficiency of the two other, alternative bases on which the district court rested its judgment – namely, with respect to proximate causation or the discretionary-function exemption to the government's waiver of sovereign immunity, *see* 28 U.S.C. § 2680(a).