**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 8, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JESUS CARDENAS-ALATORRE,

      Defendant-Appellant.

No. 06-2101

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-05-1158 JC)**

---

Roger A. Finzel, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

David N. Williams, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **HENRY**, **ANDERSON**, and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

    Jesus Cardenas-Alatorre seeks reversal of his conviction for possession with intent to distribute a substantial quantity of methamphetamine, contending primarily that the statute under which he was stopped while driving on a New

Mexico highway is unconstitutionally vague and, therefore, the drugs discovered pursuant to that stop should have been suppressed. The state statute in question makes it a misdemeanor for a car's license plate to be obscured by "foreign material," at least in any way that renders the plate less than "clearly legible." Reluctant to venture into constitutional thickets unnecessarily, we hold that, whatever the constitutional status of the statute in question, the arresting officer acted in an objectively reasonable manner and, under Supreme Court precedent, this suffices to permit the fruits of the search to be used against Mr. Cardenas-Alatorre. It is on this basis that we affirm his conviction.

I

Around noon on May 11, 2005, Deputy Peter Roth of the Bernalillo County Sheriff's Department stopped Mr. Cardenas-Alatorre on Interstate 40 just outside of Albuquerque, New Mexico. Appellant's Br. 3; Tr. at 9-11.[1] Deputy Roth testified that he pulled over Mr. Cardenas-Alatorre because a license plate frame, one of those supplied by auto dealers anxious for free advertising, obscured a portion of the license plate on his car – specifically, the entirety of the name of the state of registration, Arizona. Tr. at 10. This, Deputy Roth believed, constituted a violation of a New Mexico statute requiring a license plate to be

_____

[1] Citations to the transcript refer to the hearing on defendant's motions to suppress evidence and dismiss the indictment held in the United States District Court of New Mexico on September 22, 2005.

attached to the rear of every vehicle that is "clearly visible[] and . . . free from foreign material and in a condition to be clearly legible." N.M. Stat. Ann. § 66-3-18(A) (1998 N.M. Laws, Ch. 48, § 4 (eff. July 1, 1998)) (in effect on May 11, 2005).[2] The license plate frame did not, however, obscure other pertinent information, including the license plate number, the registration stickers, the image of the distinctive Arizona saguaro cactus, or the top half of the state's "Grand Canyon State" motto. Tr. at 37-40; Def.'s Ex. A. During questioning by the district court judge, Deputy Roth admitted that, based on the information that was visible, the license plate "appeared" to be issued by Arizona, though he had qualms it might be "fictitious" because he could not see the word "Arizona." Tr. at 40.

During the ensuing conversation with Mr. Cardenas-Alatorre, Deputy Roth expressed his concern about the obscuring license plate frame and then asked for, and obtained, Mr. Cardenas-Alatorre's vehicle registration, insurance information, and driver's license. Tr. at 12-13.[3] In doing so, Deputy Roth detected that "there was an extreme odor of air freshener which is, in my past experience, a masking agent" for drugs; he also thought Mr. Cardenas-Alatorre appeared "extremely

---

[2] The statute was subsequently amended; however, no portion of the statute relevant to this case was altered. *See* 2005 N.M. Laws, Ch. 16, § 1 (eff. June 17, 2005).

[3] Deputy Roth spoke with the defendant in Spanish as the defendant appeared not to understand or speak English well. Tr. at 12.

nervous." *Id.* at 14-15.  Accordingly, Deputy Roth ordered Mr. Cardenas-Alatorre to step out of the vehicle.  *Id.* at 18.  After conducting a computer investigation in his patrol car, Deputy Roth confirmed that the car driven by Mr. Cardenas-Alatorre was not stolen and no outstanding warrants existed for either Mr. Cardenas-Alatorre or his passenger, Felis Sosa-Reyes.  *Id.* at 21.  Deputy Roth then turned on the video camera affixed to his patrol car, returned Mr. Cardenas-Alatorre's documents, and issued Mr. Cardenas-Alatorre a citation for failure to display the license plate properly.  *Id.* at 21-22.[4]

As the traffic stop wound down, Deputy Roth asked Mr. Cardenas-Alatorre if he could speak with him further, to which Mr. Cardenas-Alatorre responded, "About?"  *Id.* at 23, 88-89.  Deputy Roth replied by asking whether Mr. Cardenas-Alatorre had any illegal items inside the car, including drugs, to which Mr. Cardenas-Alatorre answered in the negative.  *Id.* at 24-26, 58-59.  Deputy Roth next sought permission to search the vehicle.  Mr. Cardenas-Alatorre variously shrugged and nodded his head affirmatively in response.  *Id*. at 25-26, 59-60; *see generally* DVD.  Deputy Roth asked the question again and Mr. Cardenas-Alatorre then verbally responded definitively, yes.  *Id*. at 60-61.[5]  At about this

---

[4]  Entered as part of the record was a digital video disc which recorded both the audio and visual content of much of the May 11, 2005 stop (the "DVD").

[5]  Deputy Roth subsequently clarified his request to search the car by specifically asking whether he could search the entire car, including every compartment within the car.  Mr. Cardenas-Alatorre again responded in the

(continued...)

- 4 -

point, New Mexico State Police Sergeant Rudy Mora, who had been patrolling the area independently, saw Deputy Roth's car and stopped at the scene. *Id.* at 27-28, 99. Sergeant Mora had with him a trained narcotics detection dog. *Id.* at 27, 99-100; DVD. As Sergeant Mora walked the dog around the perimeter of the vehicle, the dog alerted to the area near the glove box. Tr. at 100-03. Deputy Roth then searched that area and found two wrapped packages containing methamphetamine. *Id.* at 31-33.

Mr. Cardenas-Alatorre moved the district court to suppress the methamphetamine seized during the traffic stop and to dismiss the indictment. In support of these motions, Mr. Cardenas-Alatorre argued (i) that the traffic stop was an unlawful seizure because it was based upon an unconstitutionally vague statute; (ii) even assuming the statute were constitutional, Deputy Roth did not have reasonable suspicion to stop Mr. Cardenas-Alatorre because he did not violate the statute; and (iii) Mr. Cardenas-Alatorre did not voluntarily consent to the search of his car. The district court rejected these arguments and Mr. Cardenas-Alatorre thereafter pled guilty subject to his right to appeal the district court's denial of his motions. Appellee's Br. 6.[6]

---

[5](...continued)
affirmative. *See* DVD at 4:26-4:51.

[6] On appeal, Mr. Cardenas-Alatorre pursues only his motion to suppress on the three bases aforementioned; he does not seek reversal of the district court's denial of his motion to dismiss the indictment.

II

Before us, Mr. Cardenas-Alatorre argues primarily that the fruits of the officers' search of his car should be suppressed because the New Mexico statute at issue, at least as applied,[7] is unconstitutional. Mr. Cardenas-Alatorre submits that the statute is so opaque that police officers and prosecutors can use it as something of a blank slate on which to write their own private conceptions of what the law ought to be, thereby effecting traffic stops capriciously and in violation of the Constitution's prohibition against statutes of "standardless sweep" that fail to establish "minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

The curative aim of the void for vagueness doctrine is vital and twofold, seeking to ensure that penal statutes "define the criminal offense with sufficient definiteness" in order both to apprise the citizenry of what conduct is prohibited and to prevent police from arbitrarily enforcing the laws and thereby effectuating a form of state-sanctioned discrimination. *Kolender*, 461 U.S. at 357. The arbitrary enforcement problem is especially troublesome because it carries with it

---

[7] "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Animating this rule is the courts' aspiration to avoid invalidating penal statutes on vagueness grounds "simply because difficulty is found in determining whether certain marginal offenses fall within their language." *See generally United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32-36 (1963).

the potential to emasculate the rights of citizens – conditioning their ability to go about their daily business on "the whim of any police officer." *See Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965).[8] If the New Mexico statute was, as Mr. Cardenas-Alatorre alleges, unconstitutionally vague as applied in this case, it follows that the traffic stop and the search of the car culminating in the methamphetamine possession would have occurred in violation of his Fourth Amendment right against unreasonable searches and seizures. The traditional remedy for such violations, of course, is the exclusion of the evidence obtained as a result of the unlawful search. *Illinois v. Krull*, 480 U.S. 340, 347 (1987); *see also Hudson v. Michigan*, – U.S. –, 126 S.Ct. 2159, 2163-64 (2006); *Mapp v. Ohio*, 367 U.S. 643 (1961).

But this remedy is not exceptionless. The Supreme Court has repeatedly instructed that the exclusionary rule ought not to be deployed when officers act in good faith – that is, in "objectively reasonable reliance" upon a statute – even though the statute ultimately may be found unconstitutional. *Krull*, 480 U.S. at 355; *see also United States v. Leon*, 468 U.S. 897 (1984). The rationale animating the good faith exception is, we are told, in harmony with the

---

[8] Not incidentally, vague laws also pose a danger to separation of powers: "'if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large[,t]his would, to some extent, substitute the judicial for the legislative department of government.'" *Kolender*, 461 U.S. at 358 n.7 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)).

underlying purpose of the exclusionary rule, for if "the officer is acting as a reasonable officer would and should act in similar circumstances[, e]xcluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Leon*, 468 U.S. at 920 (internal quotation omitted).

We find this exception applicable and dispositive here. Even assuming (without deciding) that Mr. Cardenas-Alatorre is correct that the New Mexico statute is unconstitutional as applied to him, we are unable to conclude that Deputy Roth acted in an objectively unreasonable manner.[9] Although the statute's opening directive that license plates must be located "in a place and position so as to be clearly visible," might not, when read in isolation, be the most specific statutory command known to bar and bench, the following clause adds that the plate must "be maintained free from foreign material and in a condition to be clearly legible." This latter language arguably complements what precedes, narrowing the contours of the conduct prohibited by the statute.[10]

---

[9] Our path in this case is consistent with our general wish to avoid, when possible, deciding constitutional questions and thereby overturn legislative enactments and etch in stone rules of law beyond the reach of most democratic process. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345 (1936) (Brandeis, J., concurring) ("'It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility.'" (quoting 1 Cooley, *Constitutional Limitations* 332 (8th Ed.))).

[10] *See NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.) ("Words are not pebbles in alien juxtaposition; they have only a communal

(continued...)

- 8 -

Under this view, the law, taken as a whole, sets out to proscribe "foreign material" (including the auto dealer's advertising frame) to the extent that it prevents *all* of the plate from being clearly *legible* – that is, *readable*.[11]

This understanding of the statute – allowing officers to effect stops only when foreign material prevents them from reading the information contained on a license plate – would seem to channel and constrain the discretion of law enforcement at least to a sufficient degree that we would be unable to say that the law lacks "minimal guidelines." *Kolender*, 461 U.S. at 358-59. This interpretation of the statute also appears to be consistent with how the current leading New Mexico case reads the law,[12] how other jurisdictions have interpreted

---

[10](...continued) existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.").

[11] *See* Oxford English Dictionary (2d ed. 1989), *available at* Oxford English Dictionary, http://dictionary.oed.com (last visited Feb. 15, 2007) ("legible" is defined as "[t]hat can be read. . . [a]ccessible to readers . . . readable").

[12] In *State v. Hill*, 34 P.3d 139, 146-47 (N.M. Ct. App. 2001), the defendant, whose trailer hitch obscured registration stickers on his license plate, argued that in order to violate the statute "the plate itself must be obscured, not merely the registration sticker." *Id.* at 147. The New Mexico Court of Appeals rejected that argument and upheld the conviction because it determined that "registration plate" within the meaning of the statute "is a broad term" and thus the "legibility and visibility of the registration plate would include legibility and visibility of any renewal sticker." *Id.*

similar state statutes,[13] and how Deputy Roth interpreted the law here, stopping

Mr. Cardenas-Alatorre precisely because "foreign material" prevented him from

being able to *read* the word "Arizona." It is worth pausing to underscore,

however, that all of this is to say merely that the New Mexico statute is

susceptible to an interpretation that gives it a sufficiently clear and definitive

meaning such that we cannot say any reasonable officer would have been on

notice that the law fell beyond the constitutional pale; nothing in our analysis on

this score is meant to prejudge whether a vagueness challenge to the New Mexico

law shouldn't or wouldn't ultimately succeed.[14]

---

[13] *See State v. Hayes*, 660 P.2d 1387, 1389-90 (Kan. Ct. App. 1983) (in construing a Kansas statute nearly identical to that at issue here, the court held that "*all* of the tag must be legible, including the state name, which may be the most important information on the tag," even though the state motto was visible and the "statute does not specifically state that the state name must be visible." (emphasis in original)). We note that *Hayes* has been cited with approval by this Court on two separate occasions. *See United States v. Edgerton*, 438 F.3d 1043, 1048 (10th Cir. 2006); *United States v. Ledesma*, 447 F.3d 1307, 1313 (10th Cir. 2006). *See also People v. White*, 93 Cal. App. 4th 1022, 1025-26 (2001) (noting "that the Legislature meant a license plate must not be obstructed in any manner and must be *entirely* readable" where the statute required that license plates be "mounted in a position to be clearly visible, and shall be maintained in a condition so as to be clearly legible" (emphasis added and internal quotation omitted)). We further note that the existence of statutes nearly identical to the New Mexico statute undercuts Mr. Cardenas-Alatorre's argument that "other state statutes" "state precisely what on the plate must be 'clearly visible.'" Appellant's Br. 15.

[14] The cases Mr. Cardenas-Alatorre relies upon all involve statutes or regulations much broader and less specific in nature than the New Mexico law before us. *See Smith v. Goguen*, 415 U.S. 566, 568-69, 573-74 (1974) (the statute criminalized "treat[ing] contemptuously the flag of the United States"; the Court

(continued...)

Our conclusion is confirmed, indeed compelled, by the Supreme Court's

application of the good faith exception to a parallel vagueness challenge in

*Michigan v. DeFillippo*, 443 U.S. 31 (1979). There, the defendant argued that a

Detroit ordinance which made it a misdemeanor to refuse to provide identification

to police upon request was unconstitutionally vague; accordingly, he submitted,

the fruits of the search conducted incident to his arrest for violating the ordinance

should have been suppressed. *Id.* at 34. The Court framed the issue presented in

*DeFillippo* much as Mr. Cardenas-Alatorre has framed the issue before us –

asking whether the officer acted in an objectively reasonable fashion when

enforcing the statute in question or whether he "should have known the ordinance

was invalid and would be judicially declared unconstitutional." *Id.* at 37.

Assuming the law before it was impermissibly vague, the Court found the good

_____

[14](...continued)
observed that treating something "contemptuously" is an inherently subjective
determination and does not place a defendant on notice of what conduct is
prohibited); *cf. Krull*, 480 U.S. at 343, 359-60 (the statute provided for
administrative warrantless searches of auto dealers' "records" by state officials
"at any reasonable time during the night or day"; the Supreme Court held, even
assuming that the statute unconstitutionally vested too much discretion in such
officials, "the additional restrictions on discretion that might have been necessary
are not so obvious that an objectively reasonable police officer would have
realized the statute was unconstitutional without them" (quotations omitted));
*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323-24 (1978) (holding a regulation
authorizing administrative warrantless searches by government officials –
permitting inspection of the entirety of commercial workplaces at any time in
order to ferret out safety violations – unconstitutional because it "devolve[d]
almost unbridled discretion upon executive and administrative officers . . . as to
when to search and whom to search").

faith exception applicable and, in doing so, added critical specification to the nature and application of the good faith exception's "objectively reasonable officer test" in vagueness challenges to substantive criminal laws, holding that

> [p]olice are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality – with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

*Id.* at 38. Reasonable officers, we are unsurprisingly told, enforce the legislative enactments they are given and do not arrogate to themselves the right to second guess the people's representatives, except in the most extreme of cases; the Supreme Court's formulation on this score seeks to balance our respect for the primacy of the electoral process in a self-governing nation with a recognition of the free will and the concomitant responsibility each individual has for his or her actions.[15] And, as in *DeFillippo*, the good faith exception firmly disposes of the

---

[15] The tension created by an executive officer's dual obligation to follow "superior orders," but yet to remain mindful of when those orders run contrary to fundamental social norms has been widely discussed in the military context. *See generally*, Gary D. Solix, *Obedience of Orders and the Law of War: Judicial Application in American Forums*, 15 Am. U. Int'l L. Rev. 481 (1999) (discussing the Nuremberg "superior orders" defense; its tension with the core value of personal responsibility; and the application of the defense in domestic and international courts). The legitimacy of an officer's rejection of a directive is further complicated where, as here, the "order" emanates from a law created through a democratic process – for the legislation represents an issue that "has

(continued...)

claim before us for we cannot remotely say, as we must, that Mr. Cardenas-Alatorre has established the law in question to be "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Id.; see also United States v. Vanness*, 342 F.3d 1093, 1098 (10th Cir. 2003) (to same effect); Wayne R. LaFave, *Search and Seizure* § 1.3(h), at 96-97 (3d ed. 1996) (describing *DeFillippo* as reaching "an eminently sound result").

III

Alternatively, and in tension with his argument that the New Mexico statute is vague, Mr. Cardenas-Alatorre contends that the purpose of the law is merely and specifically to ensure that cars driven on New Mexico highways are properly registered; that the statute is narrowly tailored to accomplish this purpose by requiring visibility only of information necessary to determine the state of issuance, the license plate number, and registration status; and that all this information was clearly visible on Mr. Cardenas-Alatorre's plate. Appellant's Br.

---

[15](...continued)
already been decided by the people" through their freely elected representatives. Brent D. Wride, *Political Protest and the Illinois Defense of Necessity*, 54 U. Chi. L. Rev. 1070, 1083-85 (1987) (quotation omitted). Only in the rarest of instances, as reflected in the standard set forth in *DeFillippo*, is an officer expected to question the will of the majority embodied in a duly, and democratically, enacted law; like courts before us, we decline to speculate as to the class of circumstances necessitating the exercise of such judgment. *Cf. United States v. Moylan*, 417 F.2d 1002, 1009 (4th Cir. 1969) ("We are not called upon in this case to establish guidelines for determining in what extreme circumstances, if any, governmental acts may be resisted.").

34-38. Even without the word "Arizona" visible, Mr. Cardenas-Alatorre argues, Deputy Roth "admitted" that the plate was an Arizona plate by virtue of other markings on it and could see that the registration tags were current. *Id.* All this, Mr. Cardenas-Alatorre submits, compels us to find that he had effectively complied with the New Mexico statute and, accordingly, his traffic stop was objectively unreasonable under the Fourth Amendment.

As it happens, however, instead of "admitting" that he *knew* the license plate to be a valid Arizona plate, Deputy Roth testified that the plate *appeared* to be valid, adding that, because the word "Arizona" was covered, he remained concerned, based on past experience, that the plate may have been fraudulent. *See supra* p. 3. We must also disagree with Mr. Cardenas-Alatorre's (current) pinched reading of the statute as seeking only to ensure that officers can ascertain whether a car's registration tags are current. As we have already indicated above, the statute has a broader sweep, making it unlawful, at the minimum, to render *any* writing on a license plate illegible (that is, unreadable) by virtue of the presence of "foreign material"; indeed, it is precisely because of the breadth of the statute that we emphasize the limits of our decision in Part II and the fact that the constitutionality of the law remains open to challenge.[16]

---

[16] Along these lines, we also find unpersuasive Mr. Cardenas-Alatorre's rather singular interpretation of *State v. Hill*, 34 P.3d 139 (N.M. Ct. App. 2001). Mr. Cardenas-Alatorre reads *Hill* as holding that the statute can be violated only

(continued...)

Finally, Mr. Cardenas-Alatorre submits that, even if the initial stop itself was valid, the scope and duration of his detention were excessive because he did not voluntarily consent to Deputy Roth's continued questioning at the conclusion of the traffic citation process. Appellant's Br. 39.

In assessing Mr. Cardenas-Alatorre's claim, we note that, under our precedents, if, at the conclusion of a traffic stop a driver voluntarily consents to further questioning, no seizure takes place and "the Fourth Amendment's strictures are not implicated." *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (internal quotation omitted). But to decide whether consent is voluntarily given or coercively extracted, we ask "whether a reasonable person would believe he or she was free to leave or disregard the officer's request" under the totality of the circumstances. *Ledesma*, 447 F.3d at 1314 (quotation omitted); *see also United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) ("[A] coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice" may provide an objectively reasonable basis for a driver to believe

---

[16](...continued)
if an officer cannot verify whether registration stickers on the plate are for the current year. But, though that was the specific problem at issue in *Hill*, the court there made amply clear its view that "registration plate" is "a broad term" and that the statute's legibility requirement "include[s]," but isn't limited to, the readability of registration stickers on the plate. *See supra* note 12.

that he or she is not free to leave. (quotation omitted)). By nature, this is a fact-laden inquiry, depending heavily on "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." *Guerrero*, 472 F.3d at 789 (quotation omitted). And we defer significantly to a district court's factual findings, reversing them only in the presence of clear error – that is, "a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer." *Watson v. United States*, __ F.3d __, 2007 WL 1300693, at *5 (10th Cir. May 4, 2007).

Mr. Cardenas-Alatorre first argues that his response to Deputy Roth's request to question him – "About?" – by its plain terms did not amount to consent to further questioning. Reply Br. 14-15. While Mr. Cardenas-Alatorre's contention has a certain appeal, the district court construed the remark and surrounding events somewhat differently, interpreting Mr. Cardenas-Alatorre as having consented to continue his discussion with Deputy Roth though also as reserving the right not to answer depending upon the particular question asked:

> "About?" means to me: "What do you want to talk to me about?" It's pretty clear . . . . If he didn't want to answer, he doesn't have to answer. That's up to him. But he answered and he gave consent to search the car.

Tr. at 145. Mr. Cardenas-Alatorre identifies no convincing reason for us to reject this interpretation as clearly erroneous. Merely providing an alternative interpretation of the facts, as he does, will not suffice. *See Watson*, 2007 WL

1300693, at *6 ("[W]e are unable to conclude that [the appellant] has met her burden of showing clear error merely by pointing to competing testimony.").

Next, Mr. Cardenas-Alatorre submits that, even if he did consent to further questioning, his consent was involuntarily extracted. In support of this argument, Mr. Cardenas-Alatorre directs us to Deputy Roth's failure to tell the defendant he was free to leave; the "barrage of questions" Deputy Roth asked; Deputy Roth's tone of voice; and Sergeant Mora's arrival with a barking drug detection dog. Appellant's Br. 42.[17] The district court did not make any specific findings on these matters, but its more general finding that Mr. Cardenas-Alatorre "gave consent to search the car," Tr. at 145, necessarily implies a rejection of the defendant's version of events, and we are obliged to "affirm the district court's suppression ruling if any reasonable view of the evidence supports that ruling." *United States v. King*, 222 F.3d 1280, 1283 n.2 (10th Cir. 2000) (citations omitted).

We have viewed the DVD supplied by counsel recording the traffic encounter between Mr. Cardenas-Alatorre and Deputy Roth, and it simply fails to reflect the sort of coercive atmosphere Mr. Cardenas-Alatorre describes. Deputy

_____

[17] Mr. Cardenas-Alatorre's related suggestion that Deputy Roth had an affirmative obligation to tell him that he was free to go once he returned Mr. Cardenas-Alatorre's documents is foreclosed by our case law. *See, e.g., United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005); *see also Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996).

Roth returned Mr. Cardenas-Alatorre's documents and issued the citation before seeking permission to ask further questions; he employed no intimidating body language or tone; and he did not block or otherwise prevent Mr. Cardenas-Alatorre from returning to his car. An illustration of the relaxed tenor of their conversation was Deputy Roth's joke, while casually tugging at his belt, that he is "a little fat," to which Mr. Cardenas-Alatorre laughed and responded in kind, "I'm a little fat, also." Tr. at 52. The video recording also indicates that, while Sergeant Mora arrived on the scene as this discussion took place, Mr. Cardenas-Alatorre's back was facing the direction from which Sergeant Mora arrived; thus, neither Sergeant Mora nor his dog were even visible to Mr. Cardenas-Alatorre when Deputy Roth requested permission to search. *See United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir. 2003) (consent was not coerced even though a drug detection dog was howling loudly during the trooper's questioning because the dog was in the patrol car and not in direct contact with defendant); *cf. Guerrero*, 472 F.3d at 789-90 (no "threatening environment" existed although two officers were present because one "sat at a distance away and had no interaction with [the defendants]"); *United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006). Under these circumstances, we see no legally sufficient basis for overturning the district court's conclusion that Deputy Roth's continued questioning and subsequent search of the car were part and parcel of a consensual encounter.

\* \* \*

For the foregoing reasons, the judgment of the district court is

*Affirmed.*