FILED
United States Court of Appeals
Tenth Circuit

June 2, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MELVIN L. MATHIS,

      Plaintiff - Appellant,

v.

HUFF & PUFF TRUCKING, INC., a
Tennessee corporation; DONALD
STEWART,

      Defendants - Appellees.

No. 13-8082

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 2:12-CV-00029-NDF)**

---

Frederick J. Harrison, Rawlins, Wyoming, appearing for Appellant.

Patrick J. Murphy (David E. Shields with him on the brief), Williams, Porter, Day &
Neville, P.C., Casper, Wyoming, appearing for Appellees.

---

Before **BRISCOE,** Chief Judge, **MURPHY** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

On February 18, 2008, Donald Stewart, driving a semi-tractor trailer, hit the back

of a tow truck driven by Melvin Mathis. Mr. Mathis sued Mr. Stewart and his employer,

Huff & Puff Trucking, Inc., for negligence in the District of Wyoming. On August 9, 2013, after a bench trial, the district court issued findings of fact and conclusions of law. The court determined Mr. Stewart was 100 percent at fault for the accident, and entered judgment in favor of Mr. Mathis. The damages award, which was significantly less than Mr. Mathis sought, was based on findings that his spinal injuries from the accident were only temporary and he did not suffer a mild traumatic brain injury ("MTBI"). On September 6, 2013, Mr. Mathis moved for a new trial, arguing, among other things, that the judge's law clerk had an undisclosed conflict of interest. The court denied the motion.

On appeal, Mr. Mathis challenges (1) the district court's factual findings relating to his back and head injuries, (2) whether the court impermissibly allowed a defense expert to testify beyond his qualifications as a biomechanical engineer, and (3) the court's denial of his motion for a new trial based on the alleged law clerk conflict.[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  **BACKGROUND**

### A.  *Factual History*

On February 18, 2008, Mr. Stewart, a driver for Huff & Puff, hit Mr. Mathis's tow truck from behind with his semi-tractor trailer on Interstate 80 near Rawlins, Wyoming.

---

[1] Mr. Mathis also challenges the district court's damages award as clearly erroneous. He does not, however, raise any independent ground for reversing the court's damages award beyond his challenge to the district court's factual findings. Our determination that the district court's factual findings were not clearly erroneous resolves this issue.

Mr. Stewart was at fault for the accident. He was driving too fast for the icy road conditions and should not have been traveling in the left lane. The crash damaged the tow truck, but Mr. Mathis was "ambulatory, functional and coherent" immediately following the accident. App. at 74. He called 911, and an ambulance took him to the emergency room. The emergency room doctor found no evidence of head trauma, but noted Mr. Mathis strained his neck and back. Mr. Mathis was released later that evening.

Before the accident, Mr. Mathis had a back condition. He had undergone spinal surgeries in 1989 and 1993. Four days after the accident, Mr. Mathis saw Dr. Kenneth Schulze for follow-up care for his back and neck pain. Dr. Schulze reviewed x-rays taken the day of the accident and ordered MRIs of Mr. Mathis's spine. He concluded Mr. Mathis suffered "multiple areas of sprain" to his spine from the collision. Aplee. Supp. App. at 78. He noted Mr. Mathis had preexisting disc lesions, which the accident had aggravated. He referred Mr. Mathis to Dr. Judson Cook, a neurosurgeon at Wyoming Spine and Neurosurgery Associates, L.L.C.

Dr. Cook diagnosed Mr. Mathis with "cervical, thoracic and lumbar sprains and/or material aggravation of preexisting asymptomatic degenerative [spinal] disease." App. at 81. He prescribed a conservative treatment plan of physical therapy and massage. He allowed Mr. Mathis to return to light duty work in March 2008 and removed all work restrictions except avoiding heavy or repeated lifting in April 2008. Mr. Mathis saw Dr. Cook several times over the next year. Dr. Cook reported that Mr.

Mathis's condition was slowly improving, though he was still symptomatic and experiencing discomfort.

In May 2009, Mr. Mathis saw Dr. Cook for the last time. Dr. Cook reported that Mr. Mathis "was doing fairly well with conservative and medical management." *Id.* at 83. Mr. Mathis requested to continue conservative therapy and planned to see Dr. Cook in two months for a follow-up appointment. Following the May 2009 visit, however, Mr. Mathis did not return to Wyoming Spine and Neurosurgery for nearly two years.

During those two years, Mr. Mathis worked as a nighttime fuel delivery man, working 12-hour shifts, 20 to 25 days a month. Mr. Mathis was under no work restrictions, and the job was physically demanding, requiring him to drag a 200-foot hose, refuel multiple pieces of fracking equipment, and install heavy tire chains to get around. In 2011, his employer lost a big fuel delivery contract. After that, Mr. Mathis continued to work full time doing mechanic work, driving a tow truck, and delivering fuel as needed.

In April 2011, Mr. Mathis returned to Wyoming Spine and Neurosurgery and saw a different neurosurgeon, Dr. Steven Beer. Mr. Mathis complained about lower back pain, and Dr. Beer ordered new MRIs and x-rays. The images were essentially unchanged from the MRIs and x-rays taken in 2008. In September 2012, Dr. Beer performed two-level lumbar fusion surgery on Mr. Mathis to relieve his chronic pain.

### B.  *Procedural History*

1. **Initiation of Lawsuit and Bench Trial**

On February 9, 2012, Mr. Mathis filed this negligence action in the District of Wyoming against Mr. Stewart and Huff & Puff ("Defendants").  From July 8 to July 19, 2013, the district court conducted an 8-day bench trial.  At trial, Mr. Mathis argued the accident caused permanent injuries to his spine, an MTBI, emotional distress, and pain and suffering.  He further contended his injuries required ongoing medical care and reduced his future earning capacity.  The district court heard competing evidence regarding Mr. Mathis's spinal and head injuries.[2]

2. **Testimony about Mr. Mathis's Spinal Injury**

On Mr. Mathis's back injuries, Dr. Beer testified for Mr. Mathis.  Dr. Mark Hadley, a neurosurgeon, and Dr. Toby Hayes, a biomechanical engineer, testified for the Defendants.

Dr. Beer testified that "the degenerative changes present in Mathis' cervical and lumbar spine became symptomatic because of the February 2008 collision."  App. at 86. Dr. Beer applied a "differential diagnosis approach," concluding the accident caused the injuries because Mr. Mathis's "spondylosis was asymptomatic before the accident, and symptomatic after."  *Id.*  As the court observed, "[a]ccording to Dr. Beer, this finding is consistent with an acute or subacute process, consisting of trauma causing or contributing

---

[2] The court also heard competing evidence regarding causation of the accident. The court concluded Mr. Stewart was 100 percent at fault.  This finding is not disputed on appeal.

to a material aggravation of Mathis' preexisting asymptomatic degenerative disease present in the cervical and lumbar areas of the spine." *Id.* Dr. Beer said bulging discs and a small annular tear in Mr. Mathis's L4/L5 disc supported his findings. He further described Mr. Mathis's "two-year gap in treatment as consistent with a patient who is attempting to avoid surgery for as long as possible." *Id.* at 86-87.

Dr. Hadley testified Mr. Mathis's "medical records show no evidence of injury from the collision other than temporary muscular-skeletal injuries." *Id.* at 87. He explained the images of Mr. Mathis's spine "show a typical degenerative lumbar spine," caused by aging. *Id.* He acknowledged there were disc bulges, but said they were all old. He disagreed with Dr. Beer's determination that Mr. Mathis suffered a very small annular tear. Dr. Hadley testified that because the white dot Dr. Beer identified as an annular tear appeared on both the 2008 and 2011 images, it is related to age "because such tears don't remain acute for three years." *Id.* He concluded the 2011 surgery "addressed only age-related narrowing," and no further operation would help relieve Mr. Mathis's pain. *Id.* He further identified age, arthritis, deconditioning, and smoking as potential factors contributing to Mr. Mathis's pain.

Dr. Hayes testified regarding biomechanical injury causation. He evaluated the forces of the collision and whether those forces were likely to cause the types of injuries Mr. Mathis claimed he suffered. Dr. Hayes concluded "the forces involved in the accident are far below the 'more-likely-than-not' known injury tolerance thresholds for risk of injury to Mathis' low back, cervical spine and brain." *Id.* at 88. Specifically, he

explained the potential for low back injury—like the type of injury Mr. Mathis claims he suffered from the accident—is "particularly low in rear-end automobile collisions when the low back stays in contact with the seatback." Aplee. Supp. App. at 168-69.

3. **Testimony about Mr. Mathis's Alleged Mild Traumatic Brain Injury**

In February 2013, Mr. Mathis saw a life-care planner, Francine Mazone, who suggested he might have an MTBI.[3] At her suggestion, Mr. Mathis saw a neuropsychologist, Dr. Dennis Helffenstein. Thereafter, the Defendants also hired a neuropsychologist, Dr. Paul Richards, to test Mr. Mathis for MTBI.

Dr. Helffenstein testified Mr. Mathis suffered an MTBI from the 2008 accident. He further explained as follows. Mr. Mathis meets the diagnostic criteria for MTBI because "there is a notable gap in [Mr. Mathis's] memory" immediately after the accident. Aplee. Supp. App. at 143-44. Mr. Mathis had no memory of pulling himself upright or pulling his vehicle to the side of the road after the impact. This suggested "a brief period of post-traumatic amnesia for some events immediately following the accident." *Id.* at 144. The application of the diagnostic criteria is "the beginning point of the [MTBI] diagnosis process; it is not the endpoint." Trial Tr., Vol. IV at 780. Mr.

---

[3] According to the widely-accepted MTBI diagnostic standard, a patient who has suffered an MTBI must exhibit one of the following four criteria: (1) "any period of loss of consciousness," (2) "any loss of memory for events immediately before or after the accident," (3) "any alteration in mental state at the time of the accident (eg, feeling dazed, disoriented, or confused)," or (4) "focal neurological deficit(s) that may or may not be transient." Aplee. Supp. App. at 141 (Thomas Kay et al., *Definition of Mild Traumatic Brain Injury*, 8 J. Head Trauma Rehabilitation 86, 86 (1993)).

Mathis's neurological test scores showed memory impairment, his auditory and visual concentration scores ranged from impaired to average, and his verbal reasoning and judgment results were below average—all of which are "pretty classic findings" for patients with an MTBI. *Id.* at 831.

To support his MTBI claim, Mr. Mathis also offered the testimony of his wife, Nada Mathis; his stepdaughter, Hope Waldner; and his former boss, Gregg Waldner. Mrs. Mathis testified that since the accident her husband had been short-tempered, frustrated, and depressed, and that, about a year and a half before trial, Mr. Mathis began stuttering.[4] Ms. Waldner and Mr. Waldner both testified Mr. Mathis's personality changed after the accident, and that he had trouble focusing at work.

Defendants' expert, Dr. Richards, testified Mr. Mathis did not suffer an MTBI from the collision. He cited the lack of documentation indicating confusion or memory loss immediately after the accident. He disagreed with Dr. Helffenstein's "notable gap" testimony, reporting that in his interview with Mr. Mathis, he did not find any gap in Mr. Mathis's memory immediately after the accident, but rather that Mr. Mathis "had a quite good recollection of the time immediately post-injury." Trial Tr., Vol. VI at 1498. Finally, Dr. Richards testified that "[i]n comparison to his same-aged male peers with comparable education . . . Mr. Mathis generally demonstrated an intact ([a]verage and above) neuropsychological profile with only one documented deficit," relating to his

---

[4] Evidence presented at trial indicated Mr. Mathis stuttered as a child, and the stutter re-emerged several months after the accident.

processing speed. Aplee. Supp. App. at 131. Dr. Richards explained that many non-neurological factors could deflate Mr. Mathis's processing speed score, including depression, chronic pain, or lack of sleep. And "[a]ny recent problems [Mr. Mathis] is reportedly experiencing, with stuttering, work finding, or cognitive functioning are naturally occurring problems, and not caused or aggravated by any injury from [the accident]." Aplee. Supp. App. at 133.

Dr. Hayes also testified that the force of the collision was "well below the levels necessary to produce concussion or mild traumatic brain injury." Aplee. Supp. App. at 169.

4. **District Court's Findings of Fact and Conclusions of Law**

On August 9, 2013, the district court issued findings of fact and conclusions of law. The court rejected Mr. Mathis's claim he suffered permanent spinal injuries. Instead, it concluded "[t]he weight of the evidence supports finding that [Mr.] Mathis suffered various temporary muscular-skeletal sprains from the collision, which resolved in approximately mid-2009 following conservative therapy." App. at 89. The court listed eight reasons explaining its finding, and it rejected Dr. Beer's differential diagnosis conclusion. It explained, "While Dr. Beer's differential diagnosis testimony might be persuasive if that were the only testimony in the case, such testimony is overwhelmed by the other evidence listed above." *Id.* at 90.

The district court also found Mr. Mathis did "not suffer MTBI from the 2008 collision." *Id.* at 92. It based this finding on its "view that the testimony from Dr.

-9-

Richards and Dr. Hayes is more persuasive than the testimony from Dr. Helffenstein."

*Id.* It said Dr. Helffenstein placed "undue emphasis" on Mr. Mathis's claimed memory

loss, which was both inconsistent with Mr. Mathis's other statements in the record and

inconsequential given the details from the accident Mr. Mathis "admittedly remembers."

*Id.* at 92. The court further explained that "no medical documentation indicates that

[Mr.] Mathis was confused, disoriented, or repeated information or questions indicative

of MTBI." *Id.* It stated, "[I]t strains credulity to attribute [Mr.] Mathis' below-average

testing scores to [an] MTBI from a collision that occurred five years earlier." *Id.* at 93.

Based on its findings, the district court awarded Mr. Mathis $145,582 in damages:

$30,000 for reasonable medical and out-of-pocket expenses incurred through mid-2009;

$100,000 for past emotional distress, pain and suffering, and loss of enjoyment of life;

and $15,582 for loss of income from 2008 to mid-2009.

5. **Alleged Undisclosed Law Clerk Conflict**

Two weeks after trial, Mr. Mathis's attorney, Frederick Harrison, learned of a

potential issue regarding the district judge's law clerk and her husband, a partner at a

Wyoming law firm.[5] On July 15, 2013, Huff & Puff's insurer, American International

---

[5] Mr. Harrison stated in his affidavit before the district court that he learned of the potential conflict "over a week after the trial." App. at 108. He subsequently clarified, in a 28(j) letter to this court, that he learned of the potential conflict on August 2, 2013, two weeks after trial had concluded.

Group, Inc. ("AIG"), hired the husband's firm to monitor the second week of trial.[6]  It did so after learning that, over the prior weekend, Mr. Harrison had met with Huff & Puff's personal attorney to discuss the possibility of entering into a consent judgment with Huff & Puff in excess of its policy limit with AIG and pursuing a bad faith action against AIG.[7]  This did not happen, but AIG hired the husband's firm to monitor the remainder of trial, paying on an hourly basis.  Three partners, including the law clerk's husband, shared monitoring responsibility.  Although Mr. Harrison was aware the husband was monitoring the trial, he did not know the clerk and her husband were married until another attorney brought it to his attention after trial had ended.

The law clerk was present for all pretrial proceedings and was in the courtroom throughout trial.  The day her husband first appeared in the gallery, she advised the judge she had learned the previous evening her husband had been asked to monitor the trial for AIG.  The clerk inquired if she should separate herself from the case.  The judge responded that she—the judge—would be drafting and finalizing the opinion in the case herself, and that AIG "was not a party in the proceeding and it had no visible presence at trial," nor had the clerk's husband entered an appearance in the case.  *Id.* at 153.  The

---

[6] AIG had previously hired Patrick J. Murphy and his firm, Williams, Porter, Day & Neville, to represent its insureds, Huff & Puff and Mr. Stewart, in Mr. Mathis's negligence suit.

[7] Huff & Puff would enter into a judgment for an amount in excess of Huff & Puff's $1 million policy limit with AIG and assign its rights against AIG to Mr. Mathis. Mr. Mathis would covenant not to collect the judgment against Huff & Puff, but instead would seek to collect the entire judgment against AIG if he could later prove AIG acted in bad faith.

judge told the clerk she had no duty to separate herself from the case, but allowed the clerk to attend trial only in a ministerial and observational role.

The judge wrote in the memorandum order denying Mr. Mathis's motion for a new trial that once trial concluded and the case was taken under advisement, the law clerk had no further contact with the case, and that she—the judge—researched, drafted, and finalized the opinion based on the record and her personal notes.

6. **Mr. Mathis's Motion for a New Trial**

On September 6, 2013, seven weeks after trial had ended and five weeks after he had learned about the law clerk and her husband's relationship, Mr. Mathis filed a motion for a new trial under Federal Rule of Civil Procedure 59(a) and a motion to alter or amend the judgment under Rule 59(e). In his motion for a new trial, Mr. Mathis argued: (1) the evidence did not support the district court's factual findings that Mr. Mathis suffered only a temporary sprain and did not suffer an MTBI; (2) the court erroneously relied on Dr. Hayes's testimony because it went beyond his qualifications as a biomechanical engineer; and (3) the law clerk had an undisclosed conflict of interest. The motion to alter or amend the judgment argued the judgment should be amended to correct an inadequate damages award based on the court's erroneous rulings. The court denied both motions.

Mr. Mathis timely appealed.

## II. **DISCUSSION**

On appeal, Mr. Mathis argues the district court erred in (A) finding he suffered only a temporary sprain and did not suffer an MTBI, (B) admitting Dr. Hayes's testimony as going beyond his qualifications as a biomechanical engineer, and (C) denying his motion for a new trial based on the alleged undisclosed law clerk conflict. We conclude the record supports the district court's factual findings regarding Mr. Mathis's injuries, Mr. Mathis did not adequately challenge Dr. Hayes's testimony in the district court, and the alleged law clerk conflict does not warrant a new trial. Accordingly, we affirm the district court's judgment.

### A. *District Court's Factual Findings*

### 1. **Standard of Review**

Mr. Mathis challenges two of the district court's factual findings. "In an appeal from a bench trial, such as in this case, we review the district court's factual findings for clear error . . . ." *Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009) (quotations omitted). "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1183 (10th Cir. 2009) (quotations omitted). "In conducting this review, we view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence." *Id.* (quotations omitted).

-13-

"It is not the role of an appellate court to retry the facts, because the court below has the exclusive function of appraising credibility, determining the weight to be given testimony, drawing inferences from facts established, and resolving conflicts in the evidence." *Holdeman*, 572 F.3d at 1192 (quotations omitted). "That the record supports a view of the evidence that is permissible but contrary to the trial court's findings is not sufficient to warrant upsetting the lower court's findings." *Id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).

2. **Analysis**

   a. *Spinal injury*

First, Mr. Mathis challenges the district court's finding his spinal injuries from the accident were only temporary sprains. He argues the court unduly relied on medical records and that it gave inadequate weight to the testimony of Dr. Beer, Mrs. Mathis, Ms. Waldner, and Mr. Mathis's former employer, Mr. Waldner. We conclude Mr. Mathis has not shown that the court's spinal injury finding is clearly erroneous.

Trial evidence supported the district court's finding. The court's order included 16 findings addressing Mr. Mathis's spinal injuries from the accident. The court considered extensive evidence presented in Mr. Mathis's medical records since the accident, including records from Dr. Schulze, Dr. Cook, and Dr. Beer. It also considered the testimony of Mr. Mathis, Mrs. Mathis, Mr. Waldner, Dr. Beer, Dr. Hadley, Dr. Hayes, and others. The court determined Mr. Mathis suffered only temporary muscular-skeletal

sprains from the collision, and the sprains resolved in approximately mid-2009. Among other evidence, the court based this finding on post-collision medical records diagnosing Mr. Mathis with "cervical, thoracic, and lumbar sprains"; Mr. Mathis's two-year gap in treatment when he was engaged in strenuous employment activities; and medical records after the two-year gap in treatment attributing his spinal issues to a degenerative condition and not the accident. App. at 89. The court also based the finding on the testimony of defense experts Dr. Hadley and Dr. Hayes. It determined "Dr. Beer's differential diagnosis testimony . . . [was] overwhelmed by the other evidence [in the case]." App. at 90.

Mr. Mathis's reference to testimony contrary to the court's finding does not establish clear error: "[P]ointing to conflicting evidence inconsistent with the district court's finding is insufficient, standing alone, to establish clear error." *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1161 (10th Cir. 2007). "[E]very trial is replete with conflicting evidence, and in a bench trial, it is the district court, which enjoys the benefit of live testimony and has the opportunity firsthand to weigh credibility and evidence, that has the task of sorting through and making sense of the parties' competing narratives." *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007). The district court resolved the parties' conflicting evidence in favor of the Defendants. The court's finding that Mr. Mathis's spinal injuries were only temporary was not clearly erroneous.

b. *Mild traumatic brain injury*

Second, Mr. Mathis challenges the district court's finding he did not suffer an MTBI. He attacks the finding as "simplistic," Aplt. Br. at 41, and contends the court "completely ignored" many facts and nuances showing that he suffered an MTBI, *id.* Specifically, he argues the court's finding does not adequately address the testimony of Dr. Helffenstein, Mrs. Mathis, Ms. Waldner, and Mr. Waldner.

Again, the record supports the court's finding. Mr. Mathis's primary argument is the district court gave Dr. Helffenstein's testimony short shrift. A district court's factual findings need not contain every detail of a witness's trial testimony. *Lesch v. United States*, 612 F.3d 975, 981 (8th Cir. 2010) ("[F]indings of fact should be clear, specific, and complete, without unrealistic and uninformative generality on the one hand, and without an unnecessary and unhelpful recital of nonessential details of evidence on the other." (quotations omitted)). The court adequately explained why it found Dr. Helffenstein's testimony unpersuasive, noting he "placed undue emphasis on [Mr.] Mathis' statement that he does not remember moving his vehicle to the side of the road," App. at 92, and that this memory loss testimony was inconsistent with Mr. Mathis's other testimony. That the court found Dr. Richards's testimony more persuasive than Dr. Helffenstein's does not make its finding clearly erroneous.

Mr. Mathis again attempts to establish clear error by pointing to conflicting testimony. The evidence, however, supports the district court's finding that Mr. Mathis did not suffer an MTBI. The court relied on Dr. Richards's testimony that Mr. Mathis

did not meet any of the diagnostic criteria for MTBI, did not have memory loss about the accident, and his below-average test scores were likely related to non-neurological factors. The court further relied on the lack of medical records from the five years after the accident demonstrating any suspicion, much less a diagnosis, that Mr. Mathis suffered from an MTBI. Because the evidence presented at trial supported the court's factual finding, we conclude the finding was not clearly erroneous.

### B. *Admission of Dr. Hayes's Testimony*

### 1. **Legal Background and Standard of Review**

Under Federal Rule of Evidence 702,

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). To determine whether an expert's opinion is admissible, the district court must undertake a two-step analysis. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). First, the court must determine whether the expert is "qualified 'by knowledge, skill, experience, training, or education'

-17-

to render an opinion." *Id.* (quoting Fed. R. Evid. 702). Second, "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *Id.*

When an appellant properly preserves an objection to expert evidence, we review whether the district court applied the proper legal test in admitting expert testimony de novo and the court's application of that standard for abuse of discretion. *Nacchio*, 555 F.3d at 1241. But when, as here, "there is no objection to the expert testimony, the opposing party waives appellate review absent plain error." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000). "To show plain error, a party must establish the presence of (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011).

2. **Analysis**

Mr. Mathis challenges only whether Dr. Hayes's testimony exceeded the scope of his qualifications as a biomechanical engineer. Relying on *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299 (6th Cir. 1997), he argues the district court improperly allowed Dr. Hayes to testify that the forces involved in the collision were insufficient to cause Mr. Mathis's injuries. Biomechanical engineers, he contends, are qualified to testify only to "what injury causation forces are in general and . . . how a hypothetical

person's body will respond to them," not how a specific person will respond to an accident. Aplt. Br. at 43 (quoting *Smelser*, 105 F.3d at 305) (emphasis omitted).

The district court received expert testimony through pre-filed witness statements, which were admitted into evidence before trial. At trial, the experts took the witness stand for cross-examination and redirect examination. Defendants argue Mr. Mathis forfeited any objection to the scope of Dr. Hayes's testimony because, as the district court explained in its denial of Mr. Mathis's motion for a new trial, Mr. Mathis never filed an objection to Dr. Hayes's witness statement nor did he object to any questions seeking to elicit such testimony during trial. We agree.

Mr. Mathis did not file a *Daubert* motion under Federal Rule of Evidence 104(a) to exclude Dr. Hayes's witness statement. Although Mr. Mathis points to a belated objection he made to Dr. Hayes's pre-filed witness statement, the district court correctly concluded Mr. Mathis could not object to this evidence after it had already been admitted.

After denying Mr. Mathis's belated objection, the court recognized Dr. Hayes as an expert in biomechanical engineering. The court instructed Mr. Mathis's counsel to object if he "believe[d] that the testimony either as designated or as elicited exceed[ed] the scope of [Dr. Hayes's] qualifications given his training and education as an anatomist and a biomechanical engineer." Trial Tr., Vol. VI at 1338. Mr. Mathis did not make any specific objections at trial to such testimony. Further, Mr. Mathis does not argue the court plainly erred in admitting Dr. Hayes's testimony. *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1151 (10th Cir. 2012) ("The burden of establishing plain

-19-

error lies with the appellant."). "[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court." *Richison*, 634 F.3d at 1131. Accordingly, we deem Mr. Mathis's challenge to Dr. Hayes's testimony forfeited.

### C. *Denial of Motion for New Trial*

#### 1. **Standard of Review**

We review the denial of a motion for a new trial for abuse of discretion. *Minshall v. McGraw Hill Broad. Co., Inc.*, 323 F.3d 1273, 1283 (10th Cir. 2003). We also review a district court's denial of a motion to recuse or disqualify a judge for abuse of discretion. *United States v. Mendoza*, 468 F.3d 1256, 1262 (10th Cir. 2006) (explaining the standard of review in the context of a 28 U.S.C. § 455(a) motion).[8] "[A] court abuses its discretion only when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment." *Queen v. TA Operating, LLC*, 734 F.3d 1081, 1086 (10th Cir. 2013) (quotations omitted).

#### 2. **Analysis**

Mr. Mathis argues the law clerk's husband's representation of AIG created a conflict of interest under Canon 3(F) of the Code of Conduct for Judicial Employees or an appearance of partiality under 28 U.S.C. § 455(a), and that the district judge's failure

---

[8] On appeal, Mr. Mathis does not specifically ask for recusal of the district judge. Instead, he requests only that we vacate the judgment and remand the matter for a new trial before a jury.

to screen her law clerk adequately from the case requires vacating the judgment and remanding for a new trial. We conclude the district court did not abuse its discretion in denying Mr. Mathis's motion for a new trial because there was no actual conflict under Canon 3(F) or appearance of impropriety based on the record under § 455(a) and relevant case law to justify reversal.[9]

    a. *Canon 3(F) of the Code of Conduct for Judicial Employees*

The Code of Conduct for Judicial Employees sets forth specific rules governing law clerk conflicts of interest. *See* Code of Conduct for Judicial Employees § 320, Canon 3.[10] Three provisions in Canon 3(F) are potentially pertinent here. Canon 3(F)(2)(a) provides, in relevant part, that law clerks should not perform any official duties in any matter in which they know their spouse (1) "has a financial interest in the subject matter in controversy or in a party to the proceeding," Canon 3(F)(2)(a)(iii); (2) "is acting as a

---

[9] As the parties acknowledge and pertinent cases illustrate, the relevant time frame for analyzing the law clerk's role in this case began when she learned her husband and his firm were retained to monitor the trial. *See Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 713-714 (9th Cir. 1990) (holding § 455(a) did not require recusal of a district judge whose law clerk received a job offer from the plaintiff's law firm while the case was pending because the judge screened the law clerk from the case immediately after the firm contacted the clerk); *Hunt*, 783 F.2d at 1016 (holding a district judge did not abuse his discretion in denying a recusal motion when two of his law clerks accepted job offers from a law firm representing several defendants in the case because one law clerk had no involvement and the other law clerk was removed from the case as soon as he accepted a job with the firm).

[10] The Code of Conduct for Judicial Employees took effect on January 1, 1996. *See* Code of Conduct for Judicial Employees § 310.20(b). It applies to all judicial branch employees except judges, Justices, and employees of certain federal agencies and offices, who are subject to a separate code of conduct. *See id.* § 310.10(a).

-21-

lawyer in the proceeding," Canon 3(F)(2)(a)(iv)(B); or (3) "has an interest that could be substantially affected by the outcome of the proceeding," Canon 3(F)(2)(a)(iv)(C). As we explain below, the law clerk did not have a conflict under Canon 3(F).

First, the law clerk's husband did not have a "financial interest in the subject matter in controversy or in a party to the proceeding." Canon 3(F)(2)(a)(iii). Mr. Mathis raises this issue for the first time on appeal and does not argue plain error, which alone is a ground for rejecting his argument. *See Mendoza*, 468 F.3d at 1262. It fails in any event. Although not well developed, Mr. Mathis's argument appears to be that the clerk's husband had a "financial interest in the subject matter in controversy" because AIG paid him to monitor the trial. This misunderstands what constitutes a financial interest under the Code. The Code defines "financial interest" as "ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party." Canon 3(F)(4). The clerk's husband's arrangement with AIG and his monitoring role in the case do not fit within this definition.

Second, the law clerk's husband was not "acting as a lawyer in the proceeding." Canon 3(F)(2)(a)(iv)(B). Although AIG retained him and his firm for legal services, they were not retained to represent a party in the Mathis case. Neither the clerk's husband nor anyone from his law firm entered an appearance in the case. His firm only monitored the trial for AIG, which was not a defendant and had no presence in the trial. Mr. Mathis's attempt to stretch "acting as a lawyer in the proceeding" to include monitoring a trial on behalf of a client who is not a party to the case lacks any authority or reasonable basis.

-22-

Third, Mr. Mathis did not argue in either the district court or on appeal that the law clerk's husband had "an interest that could be substantially affected by the outcome of the proceeding." Canon 3(F)(2)(a)(iv)(C). We need not address this provision due to Mr. Mathis's failure to alert the district court or this court to its possible application. In any event, it is far too speculative to discern any interest the clerk's husband may have had in the proceeding.

We conclude the law clerk did not have a conflict under the Code.

b. *Appearance issue*

Even if there was no conflict under the Code of Conduct for Judicial Employees, Mr. Mathis contends the law clerk's presence created an appearance of partiality under 28 U.S.C. § 455(a).

    i.   <u>28 U.S.C. § 455(a)</u>

Section 455(a) states a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The purpose of § 455(a) is "to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 866 (1988).

"Section 455 contains an objective standard: disqualification is appropriate only where the reasonable person, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004); *see also Liljeberg*, 486 U.S. at 859-60. "In conducting this review, we must ask how

-23-

these facts would appear to a well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004) (quotations omitted); *see also In re Sherwin-Williams Co.*, 607 F.3d 474, 478 (7th Cir. 2010). The reasonable observer is not the judge or even someone familiar with the judicial system, but rather an average member of the public. *See United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998).

ii. Law clerk and judge appearance issues

"Even if the judge has no reason to recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned." *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416 (9th Cir. 1995). Of course, "[i]f a clerk has a possible conflict of interest, it is the clerk, not the judge, who must be disqualified." *Hunt v. Am. Bank & Trust Co.*, 783 F.2d 1011, 1016 (11th Cir. 1986); *see Hamid*, 51 F.3d at 1416 (determining that because the law clerk "had no involvement in the case at bar . . . [a] reasonable person knowing all the facts regarding [the law clerk's] relationship with the [defendant's] firm . . . would not conclude that the impartiality of [the judge's] decisions in the case should be questioned"); *Byrne v. Nezhat*, 261 F.3d 1075, 1100-02 (11th Cir. 2001) (holding a district judge did not abuse his discretion in declining to recuse himself from a case when he screened his law clerk who had previously worked for one of the law firms representing a party in a case). If a law clerk continues to work on the case in which his or her impartiality might reasonably be

-24-

questioned, however, the clerk's actual or potential conflict may be imputed to the judge. *See Hall v. Small Bus. Admin.*, 695 F.2d 175, 180 (5th Cir. 1983).

Although determining whether there is an appearance problem under § 455(a) is a fact specific inquiry, cases addressing motions to recuse judges under § 455(a) based on their law clerks' relationships are instructive.  In *Hall*, a magistrate judge's law clerk accepted a position with the plaintiff class's firm while she was working on the case for the judge, including drafting the opinion.  695 F.2d at 177-78.  The judge stated he had already made his decision before the law clerk had drafted the order, and in his words, the law clerk was "little more than an amanuensis in the case."  *Id.*  The Fifth Circuit reversed and vacated the judgment because "[w]hether or not the law clerk actually affected the magistrate's decision, her continuing participation with the magistrate in a case in which her future employers were counsel gave rise to an appearance of partiality." *Id.* at 179.

Similarly, in *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1523-25 (11th Cir. 1988), the Eleventh Circuit found a district judge had an appearance of partiality because his law clerk's father was a senior partner at a law firm representing the defendants in a civil case and the law clerk assisted in preparing the court's order granting summary judgment to the defendants.  *Id.*  The relationship between the law clerk and defense counsel was compounded by the facts that the judge credited the law clerk's work in a footnote appearing in the summary judgment order, the law clerk had held a hearing on the summary judgment motion outside the judge's presence, and the law clerk's father

-25-

was a former law clerk to the judge. *Id.* Even so, the Eleventh Circuit held the judge's failure to recuse himself was harmless error because the court reviewed the district court's grant of summary judgment de novo and determined summary judgment was proper, and because denying relief would not result in injustice in other cases or undermine the public's confidence in the judicial process. *Id.* at 1526-27.

In *Hamid*, the Ninth Circuit concluded a district court did not abuse its discretion in denying a motion for recusal. 51 F.3d at 1416. Plaintiff's counsel moved to recuse the district judge in a civil case after learning one of the judge's law clerks previously had worked for a law firm that had represented two of the defendants in a related criminal case. *Id.* The law firm also had accepted service on behalf of the defendants in the civil action. *Id.* Although the law clerk had performed extensive work on the case for the district judge, the Ninth Circuit concluded the clerk was not required to be screened from the case. *Id.* at 1416-17. It reasoned the law firm did not appear on behalf of anyone in the case and the law clerk was not aware the firm represented any of the defendants in matters related to the case. *Id.* at 1417. The court noted that an appearance of partiality does not exist merely by drawing "a line . . . connecting a person within chambers to a person or firm related, no matter how remotely, to a party in the case." *Id.*[11]

---

[11] The plaintiff also moved to recuse the judge because her other law clerk went to work for a law firm representing one of the named defendants in the action following his clerkship. The Ninth Circuit affirmed the district court's denial of the recusal motion based on this clerk's conflict because the clerk did not work on the case or discuss it with the judge. *Hamid*, 51 F.3d at 1416.

In *United States v. Martinez*, 446 F.3d 878 (8th Cir. 2006), the Eighth Circuit concluded a district judge's recusal was not required from a criminal case in which her law clerk had previously assisted in the defendant's prosecution while working at the U.S. Attorneys' Office. *Id.* at 883. The law clerk had been screened from the judge's criminal docket, but due to short staffing served as a courtroom deputy during a hearing on the defendant's motion to withdraw his guilty plea. *Id.* at 881. The court denied the motion, and the defendant filed a motion to recuse the judge from sentencing. *Id.* The Eighth Circuit decision explained that an average observer who knew all of the facts would not question the judge's impartiality given that the law clerk was screened from the case and performed only ministerial duties at the hearing. *Id.* at 883.

iii. Analysis

Although none of these cases is on all fours with the facts before us, they provide useful guideposts. On a spectrum, *Hall* and *Parker* would fall on the more serious end of possible appearance issues based on law clerks, and *Martinez* and *Hamid* would land on the other. The facts before us are closer to *Martinez* and *Hamid*, both of which did not find judicial recusal was warranted under § 455(a).

Unlike the law clerk in *Hall*, the law clerk in this case, according to the judge, did not have continuing substantive participation in the case after the potential appearance issue was brought to the law clerk's and judge's attention. Unlike the law clerk in *Parker*, the clerk in this case, according to the judge, did not assist the court in preparing

-27-

the dispositive order in the case. Unlike in both *Hall* and *Parker*, neither the clerk's husband nor his law firm represented a party in the case.

Like the law firm in *Hamid*, the law clerk's husband's law firm did not appear on behalf of anyone in the case and was even further removed than the law firm in *Hamid*. And like the law clerk in *Martinez*, the clerk in this case, according to the judge, performed only ministerial acts at the trial.

With these cases in mind, we consider more specifically whether the circumstances of the law clerk and her husband warrant reversing the district court's denial of Mr. Mathis's motion for a new trial. Before we do, we emphasize that our review of this issue is constrained not only by the abuse-of-discretion standard of review but especially by the record on appeal. Nothing in the record controverts the district court's statements that (1) the law clerk performed only ministerial functions after her husband started monitoring the trial, and (2) she did not participate in drafting the post-trial findings and conclusions. Under these facts, we cannot say the district court abused its discretion in denying the motion for a new trial.

First, the law clerk's husband did not represent a party in the case or have a financial interest in its outcome. Moreover, in light of the husband's attenuated monitoring role, s*ee Hamid*, 51 F.3d at 1417, Mr. Mathis has not explained how a reasonable observer would believe the impartiality of the court's decision might reasonably be questioned based on the law clerk and her husband's relationship. We do not see how he could do so in light of the next point.

Second, the law clerk informed the judge of her husband's monitoring role as soon as she became aware of it, and from that point the record before us shows she had no further substantive involvement with the case. *See Martinez*, 446 F.3d at 883. In her order denying Mr. Mathis's request for a new trial, the judge stated her law clerk "was not involved in the case after this point beyond a ministerial and observational role." App. at 153. The judge said she drafted the findings of fact and conclusions of law herself based on the record and her personal notes, and the clerk took no part in drafting or researching the opinion. Mr. Mathis did not ask for a hearing in district court to explore the facts further or contest them on this issue. As noted above, we may review only the record presented to us.

Although it would have been better for everyone involved if the judge had promptly disclosed the law clerk and her husband's relationship to the parties and if the clerk had stopped attending the trial, a reasonable observer who was fully informed of the facts based on the record before this court would not question the judge's impartiality. *See Liljeberg*, 486 U.S. at 859-60. Those facts indicate that, as soon as the law clerk became aware of her husband's situation, she informed the judge, who screened her from substantive work on the case. *See DeTemple*, 162 F.3d at 286 n.2 (holding that a judge did not abuse his discretion in declining to recuse himself from a criminal case in which his law clerk was married to the prosecutor because the clerk was screened from the case).

-29-

Accordingly, the district court did not abuse its discretion in denying the motion for a new trial.[12]

## III  CONCLUSION

Based on the foregoing, we affirm the district court's judgment.

---

[12] At oral argument, Defendants argued for the first time that because Mr. Mathis waited for five weeks to file his motion for a new trial in the district court, he did not timely raise the conflict or appearance issue and we should reject his argument on appeal. Our cases acknowledge that § 455(a) contains a timeliness requirement to prevent counsel from waiting until after an adverse ruling to seek recusal. *United States v. Stenzel*, 49 F.3d 658, 661 (10th Cir. 1995); *Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984). Given that Mr. Mathis did not learn of the law clerk issue until after trial had concluded and filed the motion approximately a month later, we decline to decide his motion was untimely.