FILED
United States Court of Appeals
Tenth Circuit

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**February 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

PETER D. HOLDINGS, LLC, assignee of
Black Diamond Energy, Inc., and assignee
of Black Diamond Energy of Delaware,
Inc.,

     Plaintiff - Appellant,

v.

WOLD OIL PROPERTIES, LLC, a
Wyoming limited liability corporation;
CHIPCORE, LLC, a Wyoming limited
liability corporation,

    Defendants - Appellees.

No. 20-8050
(D.C. No. 1:17-CV-00212-KHR)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

    This is an assignee's remorse case. At bottom, Peter D. Holdings, LLC ("Peter

D.") thought it financially advantageous to accept an assignment of Black Diamond

Energy, Inc.'s contractual interests in certain coalbed methane-gas wells. The

assignment was in exchange for Peter D.'s release of debts owed to Peter Dochinez

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

(Peter D.'s sole member) by Black Diamond's founder, Erik Koval. But the assignment failed to live up to Peter D.'s expectations.

As part of the deal, Dochinez and Koval had agreed to work together to recover monies owed to Black Diamond under its contract with Wold Oil Properties LLC. Specifically, Dochinez and Koval thought that Black Diamond was owed additional interest in certain wells. So, in December 2017, Peter D. sued Wold Oil and Chipcore, LLC[1] (collectively, "Wold") in the District of Wyoming. The suit resulted in a four-day bench trial in November 2019.

After the trial, the court dismissed Peter D.'s claims because, among other reasons, it was not a real party in interest. As an alternative basis for dismissal, the court held that Black Diamond hadn't earned the well interests that Peter D. believed it had. Peter D. now appeals.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's judgment that Peter D.'s claims fail on the merits. We express no opinion on the district court's alternative bases for dismissing Peter D.'s suit.[2] *See United Automobile, Aerospace v. N.L.R.B.*, 462 F.2d 298, 300 (D.C. Cir. 1972) ("It is a uniform course of appellate review procedure to decline to review questions not necessary to a decision by an appellate court.") (citation omitted); *see also Fla.*

---

[1] Chipcore was assigned some of Wold Oil's contractual interests.

[2] For example, we see no need to address the district court's holdings regarding real party in interest, judicial estoppel, and statute of limitations issues with respect to certain claims, focusing instead on the better-briefed dispositive arguments before us.

*Wildlife Fed'n Inc. v. United States Army Corps of Eng'rs*, 859 F.3d 1306, 1320 (11th Cir. 2017).

## BACKGROUND

### I.    Black Diamond, Wold Oil, and Chipcore

In the late 1990s, natural gas was in high demand. Oil-and-gas companies flocked to the Powder River Basin straddling Wyoming and Montana to lay claim to that region's untapped potential. Among the arrivals were Erik Koval and his newly founded company, Black Diamond. Black Diamond soon partnered with Wold Oil, which was already the lessee on a sizeable area in the Basin.

In September 2003, Black Diamond and Wold Oil entered a Farmout Agreement, which set out the parties' respective rights and obligations vis-à-vis what the agreement calls the "Contract Area"—about 5,400 acres in the Powder River Basin. Under the Farmout Agreement, Black Diamond could secure up to 50% of Wold Oil's interest in the Contract Area. Black Diamond first purchased a 25% interest in the Contract Area, opting to earn the remainder under the terms negotiated in the Farmout Agreement. If Black Diamond met those terms, it could earn an additional 25% of certain interests that Wold Oil held in the Contract Area.

First, Black Diamond had to "drill and complete" two "Initial Wells" by December 31, 2003. The Farmout Agreement states that the term drill and complete "means to drill and complete a well . . . that is capable of producing coalbed methane gas and commence dewatering operations in anticipation of producing coalbed

3

methane gas." R. Vol. 4 at 793. Second, if Black Diamond timely drilled and completed the Initial Wells, it then needed to drill and complete eight "Additional Wells" by May 1, 2004. Third, if Black Diamond timely drilled and completed the Initial and Additional Wells, it could earn the additional 25% interest by expending a contractually-designated amount known as the "Program Deposit"—essentially an investment commitment.

Though the Farmout Agreement set the Program Deposit at $2.5 million, it contained another provision that reduced the Program Deposit based on Black Diamond's interest in the Contract Area. All of Black Diamond's drilling costs were to be subtracted from the Program Deposit, but the agreement assumed that Black Diamond would incur less than $2.5 million in drilling costs. Thus, Black Diamond was only required to expend "the balance" of the $2.5 million—what it hadn't expended on drilling—to "hook up" the wells. The Farmout Agreement clarifies that

> [t]he term "hook up," as used herein means, to install such equipment and other facilities as are reasonably necessary to produce coal bed methane gas from the Initial Wells and Additional Wells, including, but not limited to, equipping the wells, installing electrical infrastructure, gas metering, pod house, water handling, water discharge facilities, screw compressors, reciprocating compressors, water lines, gas gathering lines, and sales line entry/tap in cost.

R. Vol. 4 at 795. But Black Diamond neglected these obligations under the contract. That is, Black Diamond spudded[3] the two Initial Wells but didn't dewater them,

---

[3] The Farmout Agreement does not define the term "spud," but the Wyoming Oil and Gas Conservation Commission defines it as "the commencement of operations for the first boring of a hole for the drilling of an oil, gas, or injection well . . . ." WOGCC Rules & Regs 055.0001.1 §2(aaa) (Definitions).

which means they couldn't produce natural gas. Nor did Black Diamond ever hook up these wells. The same goes for the eight Additional Wells: Black Diamond timely spudded them, but neither dewatered them nor hooked them up.

These breaches were consequential for Wold Oil. As a result, the wells were functionally unusable until after Wold Oil took over managing them in 2009. Still, despite not being required to do so by the Farmout Agreement, Black Diamond kept on drilling. It drilled another four wells in 2005, leading to fourteen drilled wells, but none were dewatered or hooked up.[4]

Given these failures, Wold Oil concluded that its relationship with Black Diamond needed a change. It terminated the Farmout Agreement in December 2007, citing Black Diamond's failure to expend the balance of the $2.5 million Program Deposit to hook up the wells drilled, its failure to dewater the wells, and its failure to develop the infrastructure "to put the wells on production." R. Vol. 4 at 880. For these reasons, Wold Oil advised Black Diamond that it had failed to earn the additional 25% interest in the Contract Area.

But Wold Oil's breakup with Black Diamond didn't stick. From July to September 2008, Black Diamond sent Wold Oil invoices for Wold's proportionate

---

[4] By 2007, Black Diamond was having governance problems. Two of its managing members left the company but refused to sell back their shares. So Koval created an alternate Delaware entity as a successor to Black Diamond. This entity was called Black Diamond Energy Delaware ("BDED"). Though the parties dispute the precise relationship between Black Diamond and BDED, the two are often referred to interchangeably in later documents and contractual agreements. Following the parties' lead here, we simply refer to both Black Diamond and BDED as Black Diamond because the distinction is immaterial to this opinion.

share of expenses in developing the Contract Area. Wold Oil refused to pay, insisting that the invoices included costs that Black Diamond had agreed to cover and that the invoices failed to adequately describe Black Diamond's expenditures.

To resolve this disagreement, the parties entered a two-page "Letter Agreement." The Letter Agreement reset the parties' relationship and clarified how they would share operating costs moving forward. Three provisions in the Letter Agreement bear emphasizing.

*First*, Black Diamond agreed that it would take responsibility for all the wells and accepted infrastructure expenses for the fourteen wells it had drilled until the wells were "completed, electrified, dewater[ed]," and hooked up. Once those fourteen wells were completed, Wold Oil agreed to proportionally share the operating costs on those wells moving forward. *Second*, Wold Oil agreed to pay its proportionate share of expenses on any additional wells drilled after January 1, 2008. *Third*, Wold Oil agreed to sign a "Joint Operating Agreement."

The Joint Operating Agreement, which applied retroactively to August 2007, made Black Diamond the Operator of Record for the Contract Area. As Operator, Black Diamond had to pay all contractors and suppliers for services rendered in the Contract Area. Black Diamond was also required to keep the Contract Area free from liens and encumbrances.

Black Diamond failed in both respects. After it failed to pay various service providers, liens were placed on the Contract Area. And because Black Diamond couldn't pay the liens, it resigned as Operator of Record in March 2009. The next

month, Black Diamond voluntarily delivered about $575,000 worth of inventory and equipment to the Contract Area, which Wold Oil and Chipcore later used to develop the wells.

In March 2009, Wold Oil took over as Operator of Record. But resigning as the operator didn't free Black Diamond from its remaining obligations under the Farmout Agreement. Because Black Diamond retained its working interest in the Contract Area, it was still obligated to pay its share of the operating expenses. So Wold Oil sent Black Diamond monthly joint-interest billing statements. In October 2009, after Black Diamond failed to pay several of those invoices, Wold Oil sent Black Diamond a notice of default. Black Diamond never cured its default, so Wold Oil sent Black Diamond a notice of suspension of rights. That notice suspended all of Black Diamond's rights under the Operating Agreement and placed a 300% penalty on Black Diamond's proportionate share in the wells.

## II.    Peter D. and Chipcore Assignments

By 2011, Black Diamond and Koval's related companies had amassed nearly $32 million in loans. In several financial transactions irrelevant here, the loans were eventually assigned to Peter Dochinez. On June 1, 2014, Black Diamond assigned to Peter D. all of its working interest in the Contract Area.

Just a few months later, Wold Oil assigned to Chipcore all of its rights, titles, and interests in the Contract Area. Chipcore became the Operator of Record and began sending monthly joint-interest billing statements to each working-interest owner, including Peter D.

7

Peter D. disputed any requests for joint billing. In a federal complaint, it asserted five claims against Wold Oil and Chipcore: (1) breach of contract; (2) conversion; (3) tortious interference; (4) request for an accounting; and (5) "conversion/unjust enrichment." It also asserted claims for specific performance and rescission, but those constitute potential remedies for Wold Oil's alleged contract breaches rather than stand-alone claims. The district court granted Wold Oil summary judgment on Peter D.'s claims for unjust enrichment and tortious interference but let the other claims proceed. After a bench trial in November 2019, the district court issued an order rejecting all of Peter D.'s claims.

To begin, the court held that Peter D.'s assignment was not as Peter D. thought, and that Peter D. was the real party in interest only for its accounting claim. The court then addressed the merits of Peter D.'s claims and held that its claim for breach of the Farmout Agreement failed because Black Diamond had not drilled and completed the wells as required. And Peter D.'s breach-of-contract claim based on the Letter Agreement failed too because Black Diamond had failed to cover costs as promised. The court thus rejected Peter D.'s request for reimbursement from Wold. The court also held that Peter D.'s conversion claim failed on statute-of-limitations grounds and because Peter D. lacked title to the allegedly converted property. The court also rejected Peter D.'s re-assertion of an unjust enrichment argument in its post-trial brief as untimely and, alternatively, because it was an equitable remedy inappropriate in the context of an express contract. Finally, the court held that Peter D. was not entitled to an accounting because an accounting would be proper only to

calculate damages, which Peter D. was unentitled to after its other claims failed on the merits.

Now, Peter D. appeals. We affirm the district court's judgment rejecting Peter D.'s claims on the merits.

## DISCUSSION

Peter D. appeals five rulings from the district court's bench-trial order. First, it argues that it is the real party in interest for all the claims it asserted in the district court. Second, it argues that Wold breached the Farmout Agreement by not assigning Black Diamond the additional 25% interest. Third, it argues that Wold breached the Letter Agreement by failing to pay its proportionate share of the operating expenses. Fourth, it argues it is entitled to an accounting that details the revenue and expenses related to the Contract Area. Finally, it argues that Wold's use of Black Diamond's inventory and equipment was conversion.

When an appeal from a bench trial is before us, we review factual findings for clear error and legal conclusions de novo. *Obeslo v. Great-W. Life & Annuity Ins. Co.*, 6 F.4th 1135, 1148 (10th Cir. 2021). Factual findings are clearly erroneous if they lack support in the record or if, upon review of all the evidence, the reviewing court is firmly persuaded that the district court made a mistake. *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1305 (10th Cir. 2015). Our review of the evidence will be conducted "in the light most favorable to the district court's ruling" because we "must uphold any district court finding that is permissible in light of the evidence." *Id.* (citation omitted).

9

## I.   Breach-of-Contract Claims

Peter D. argues that Wold breached both the 2003 Farmout Agreement and the 2008 Letter Agreement, and that the district court erred in concluding otherwise. We disagree.

When a federal court has diversity jurisdiction, it applies the choice-of-law principles of the state where it sits. *Century 21 Real Est. Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003). For contracts, Wyoming applies the agreement's choice-of-law provision. *Morrow v. Xanterra Parks & Resorts*, 925 F. Supp. 2d 1231, 1234 (D. Wyo. 2013) (citing *J.W. Denio Milling Co. v. Malin*, 165 P. 1113, 1116 (Wyo. 1917)). Here, because both agreements designate Wyoming law, we apply that law to Peter D.'s contract claims.

To prevail on its breach-of-contract claims, Peter D. must establish "[1] a lawfully enforceable contract, [2] an unjustified failure to timely perform all or any part of what is promised therein, and [3] entitlement of [the] injured party to damages." *Larson v. Burton Constr., Inc.*, 421 P.3d 538, 544 (Wyo. 2018) (citation omitted). For both claims, neither party disputes that the relevant agreements are enforceable. So, for each claim, we begin with the second element—whether Wold unjustifiably failed to perform its contractual obligations under the Farmout Agreement and Letter Agreement.

### A.   The Farmout Agreement

Peter D. argues that Wold breached the Farmout Agreement by not assigning the additional 25% interest to Black Diamond. According to Peter D., Black Diamond

10

substantially performed its obligations under the Farmout Agreement because it had drilled the Initial and Additional Wells and spent the balance of the Program Deposit as required. And Peter D. insists that any qualms Wold has with Black Diamond's performance concerns technical or minor breaches at best. Thus, this claim turns on what counts as substantial performance given the terms of the agreement and whether Black Diamond, in fact, substantially performed.

Whether a party substantially performed under a contract is a question of fact. *Ferguson v. Reed*, 822 P.2d 1287, 1290 (Wyo. 1991). We may reverse the district court's conclusion that Black Diamond did not substantially perform under the Farmout Agreement only if its ruling is clearly erroneous—without support in the record. *See Mathis*, 787 F.3d at 1305. Here, Peter D. fails to reference this stringent standard of review, much less overcome it.

The doctrine of substantial performance "allows a party that has substantially complied with a contract to recover for its performance despite the fact that it has breached the contract by failing to comply fully with its terms." *Larson*, 421 P.3d at 546–47 (citation omitted). "The doctrine is rooted in fairness and is intended to protect a party's right to be compensated when it has performed in all material and substantive respects and to avoid the possibility of a forfeiture due to technical, minor, inadvertent, or unimportant deficiencies." *Id.* at 547 (citation and quotations omitted).

Wold argues that Black Diamond breached the Farmout Agreement by, among other reasons, failing to begin dewatering operations on any of the wells it spudded

11

and failing to hook up the spudded wells. Because these contractual obligations weren't fulfilled, Wold argues that Black Diamond's performance was not substantial and that Wold wasn't required to convey any more of its interest in the Contract Area to Black Diamond. Upon review of the record and Farmout Agreement, we agree.

Black Diamond's breaches aren't technical, minor, inadvertent, or unimportant deficiencies in its performance. Peter D. concedes that Black Diamond never began dewatering operations and neglects to explain why this failure was insubstantial. After reading Peter D.'s briefs, we are left to guess how much labor dewatering would require, how long the process would take, or how much it would have cost Black Diamond (or a third party) to dewater the wells. We must accept the district court's factual findings unless Peter D. convinces us that they're clearly erroneous. *Mathis*, 787 F.3d at 1305. The district court concluded that "[d]ewatering the wells—a prerequisite to producing gas—went to the very essence of the contract." So it rejected the argument that Black Diamond's failure to dewater the wells was technical or minor. Put simply, Peter D. needed to persuade us that dewatering was a minor consideration. And because we lack a basis to question the district court's finding, we affirm on this point.

## B.    The Letter Agreement and Unjust Enrichment

Peter D. argues that it is entitled to damages based on Wold's refusal to pay joint-interest billings to Black Diamond. It appears to style this claim as one for unjust enrichment. But Wyoming law rejects claims for unjust enrichment when a written agreement governs the parties' relationship. *See Schlinger v. McGhee*, 268 P.3d 264, 272

12

(Wyo. 2012) ("Unjust enrichment is an equitable remedy. As such, it cannot exist where there is an express contract governing the relationship between the parties."). Because the Letter Agreement governs the parties' obligations toward the Contract Area, any unjust enrichment claim must fail.

Even construing Peter D.'s argument as one for breach-of-contract, we still would conclude that it fails. This is because Peter D. never specifies exactly which joint interest billings Wold refused to pay. To the best of our understanding, Peter D.'s claim relates to joint-interest billings that Black Diamond sent to Wold on July 1, 2008, August 1, 2008, and September 23, 2008. But we find that these claims fail based on the terms of the Letter Agreement.

Wold and Black Diamond executed the Letter Agreement to resolve these very disputes. *See* R. Vol. 4 at 901 ("Our companies have been in disagreement as to how expenses are to be allocated and paid for both the Farmout Wells and the new drilling programs under the new PODs."). Under that agreement, Black Diamond agreed to cover all costs associated with the first fourteen wells it drilled until they were completed, electrified, dewatered, and hooked up. But Wold agreed to immediately begin covering its proportionate share of any new wells that Black Diamond drilled after January 1, 2008 (assuming Wold approved the invoices). So, whether Wold breached the Letter Agreement by failing to pay these invoices turns on whether they were for the initial

13

fourteen wells or for new wells drilled after 2008. If the costs related to the initial fourteen wells, the Letter Agreement absolved Wold of any duty to pay.

The record suggests that these invoices related to the initial fourteen wells. Under the Letter Agreement, BDE had to "submit . . . invoices for the New Wells [wells drilled after January 1, 2008] for Wold's review and approval." But, as required by the Letter Agreement, Wold appears to have paid the fraction of the invoices it wasn't disputing. That is, on October 16, 2008, Black Diamond sent Wold an invoice for $689,975.78. Wold paid $684,055.51 of this amount and objected to the remaining $5,920.27 balance. Then on December 3, 2008, Black Diamond sent Wold an invoice for $480,641.63. Wold paid $58,908.02 of this amount and objected to the remaining $421,733.30 because it included costs for the fourteen wells Black Diamond agreed to cover under the Letter Agreement. True, Wold never paid the outstanding balance, but it nonetheless performed according to the Letter Agreement. That is, it paid its proportionate share of costs for the new wells drilled after January 1, 2008, and it refused to pay for costs that were Black Diamond's responsibility to cover, such as costs associated with the first fourteen wells. Peter D. presents no evidence that those invoices related to new wells that Wold should have financed. Absent such evidence, we must affirm the district court's finding that Wold didn't breach the Letter Agreement, at least by failing to pay these invoices.

## II.    Accounting

Peter D. seeks an accounting detailing Wold's and Chipcore's revenues and expenses "on all Contract Area Working Interests." An accounting is an equitable remedy that a court has discretion to order. *Y-O Invs., Inc. v. Emken*, 142 P.3d 1127,

14

1130 (Wyo. 2006). The district court ruled that Peter D.'s accounting claim was ancillary to its contract claims, and because the court concluded that Wold hadn't breached any of the contracts, there was no basis to order an accounting.

We find no error in the district court's decision. The main purpose of the accounting would have been to aid in calculating damages for Peter D.'s breach-of-contract claim. But because this claim failed, an accounting would've served no purpose. *See Y-O Invs.*, 142 P.3d at 1133.

We also conclude that Peter D.'s request for an accounting fails for an even more basic reason: both Wold and Chipcore have provided Peter D. with the documents and information it seeks. Both defendants have provided Peter D. monthly joint-interest billing statements and quarterly payout statements. Those documents show "how the revenue amount is netted out against what is owed and also provide the detail of the revenue that is attributable to each well including gross revenue numbers, taxes withheld and each owner's net." That covers what Peter D. wants from an accounting.

Still, Peter D. insists that these documents are insufficient and questions their accuracy. Peter D. points out that the documents are "internally-generated," and "black boxes that amount to the operators' self-serving statements concerning the revenues and expenses properly chargeable to [Peter D.'s] and its predecessors' accounts." Op. Br. at 36. But the depth of Peter D.'s argument ends there. It provides no evidence to support its contention that the documents are black boxes or improperly self-serving. Based on the record and the parties' briefing, it appears that

Peter D. has already received what it demands in a legally sufficient form. Thus, the district court didn't err in rejecting Peter D.'s accounting claim.

## III.    Conversion

In June 2009, after Black Diamond resigned as the Operator of Record, it still delivered about $575,000 worth of equipment and inventory to the Contract Area. Wold and Chipcore used that equipment to further develop the Contract Area. But, in less than a page and without citing legal authority, Peter D. argues that Wold converted that equipment by never paying for it as required under the Farmout Agreement.

To recover for a conversion claim in Wyoming a plaintiff must establish, among other things, that it had legal title to the converted property. *See Gould v. Ochsner*, 354 P.3d 965, 974–75 (Wyo. 2015). Here, there is no evidence that Peter D. was legally entitled to the allegedly converted property. Black Diamond voluntarily provided the inventory and equipment for the Contract Area and never assigned ownership to Peter D. For this basic reason, Peter D.'s conversion claim must fail.

## CONCLUSION

We AFFIRM the district court's judgment because each of Peter D.'s claims fail on their merits.

Entered for the Court

Gregory A. Phillips
Circuit Judge